# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DMITRIY SHIROKOV, on behalf of himself and all others similarly situated, | ) ) ) | **COMPLAINT** |
| Plaintiff, | ) ) | **CLASS ACTION** |
| v. | ) ) | JURY TRIAL DEMANDED |
| DUNLAP, GRUBB & WEAVER PLLC; US COPYRIGHT GROUP; THOMAS DUNLAP; NICHOLAS KURTZ;  GUARDALEY, LIMITED; and ACHTE/NEUNTE Boll Kino Beteiligungs Gmbh & Co KG, | ) ) ) ) ) ) | Case No. 1:10-cv-12043-GAO |
| Defendants. | ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Dmitriy Shirokov ("Plaintiff"), on behalf of himself and all others similarly situated, by his undersigned attorneys, states and alleges as follows:

### INTRODUCTION

1.      This is a proposed national class action brought by Plaintiff, on behalf of himself and 4,576 similarly situated victims (collectively, the "Class"), against DUNLAP, GRUBB & WEAVER PLLC ("DGW"); US COPYRIGHT GROUP ("USCG"); THOMAS DUNLAP ("Dunlap"); NICHOLAS KURTZ ("Kurtz");  GUARDALEY, LIMITED ("GuardaLey"); and ACHTE/NEUNTE BOLL KINO BETEILIGUNGS GMBH & CO KG ("Achte") (collectively, "Defendants") for their scheme ("Copyright Scheme") to profit from copyright infringement allegations through fraud and extortion, thereby

causing members of the Class to make millions of dollars in excess "settlement" payments and/or incur other directly related expenditures (including retaining counsel).

2.     Defendant DGW is a law firm whose attorneys (including Defendants Dunlap and Kurtz) have developed a lucrative trade in monetizing copyright infringement allegations.

3.     DGW operates the scheme in part through "US Copyright Group," which the Virginia State Corporation Commission recognizes as a "doing business as" registered alias for DGW and several other corporations with ties to DGW. Defendant USCG is a Virginia corporation managed by DGW in conjunction with Defendant GuardaLey. The GuardaLey partners in USCG are not attorneys.

4.     Defendant GuardaLey monitors and records online instances of alleged copyright infringement of motion pictures. USCG provides this "evidence" of infringement to film industry clients, but cautions them that civil prosecution of copyright claims is not "practical," in light of the financial status of individual infringers.

5.     Settlement fraud has proven a far more practical alternative for Defendants. DGW touts its USCG business model to potential clients stating one overriding goal: to "obtain settlement"—not judgments, which would require litigating and proving its allegations.

6.     On the basis of GuardaLey's records, DGW typically files a single civil complaint in the United States District Court for the District of Columbia against hundreds of individuals from all over the country, regardless of the jurisdiction where the alleged infringements took place. Their complaints allege mass online infringement of a client's film copyright and petition the Court to issue subpoenas to Internet Service Providers ("ISPs"), seeking contact information for the alleged infringers. DGW targeted almost 20,000 people in

2010 alone.[1]  Among DGW's targets are the 4,577 members of the Class, whom DGW

identified in a suit it filed on behalf of Defendant Achte related to its motion picture *Far

Cry*, Civ. A. No. 1:10-cv-00453-RMC (D.D.C., filed Mar. 18, 2010) (the "Achte action").

7.      DGW used the private information provided by ISPs to send to Plaintiff, and thousands of

        others, virtually identical "litigation settlement" demand letters.   Defendants used the

        demand letters and other means to coerce settlements, routinely demanding $1,500 from

        each recipient, increasing to $2,500 if not sent promptly, under deceptive threats of

        impending (and even more expensive) litigation.   USCG purports to provide these

        services to its clients at no cost, in exchange for a share of any settlements collected.

8.      Defendants do not genuinely intend to fully litigate the vast majority of these thousands

        of claims.   Indeed, with only thirteen attorneys on staff, DGW has issued a volume of

        demand letters that far surpasses its ability to litigate these claims case by case.

        Specifically, at all relevant times, Defendants have not genuinely intended to fully litigate

        their claims against members of the Class.

_____

[1]  In addition to the Achte action (2,094 defendants, later amended to 4,577 defendants, later amended to 140 defendants), which is the basis of the Copyright Scheme before this Court, DGW has filed virtually identical complaints regarding other films, including: Civ. A. No. 1:10-cv-00038-HHK-DAR (D.D.C., filed Jan. 8, 2010) (*The Gray Man*) (749 defendants; withdrawn without prejudice); Civ. A. No. 1:10-cv-00041-CKK (D.D.C., filed Jan. 8, 2010) (*Uncross the Stars*) (83 defendants, later amended to 195 defendants; withdrawn without prejudice); Civ. A. No. 1:10-cv-00455-RMU (D.D.C., filed Mar. 19, 2010) (*Call of the Wild 3D*) (358 defendants, later amended to 1,062 defendants); Civ. A. No. 1:10-cv-00481-RMC (D.D.C., filed Mar. 23, 2010) (*The Steam Experiment* (a/k/a *The Chaos Experiment*)) (2,000 defendants, later amended to 1,653 defendants); Civ. A. No. 1:10-cv-00569-RJL (D.D.C., filed Apr. 8, 2010) (*Smile Pretty* (a/k/a *Nasty*) and other films) (1,000 defendants, later amended to 4,350 defendants); Civ. A. No. 1:10-cv-00873-RMU (D.D.C., filed May 24, 2010) (*The Hurt Locker*) (5,000 defendants); Civ. A. No. 1:10-cv-01476-CKK (D.D.C., filed Aug. 30, 2010) (*Cornered!*) (2,177 defendants); and Civ. A. No. 1:10-cv-01520-EGS (D.D.C., filed Sept. 8, 2010) (*Familiar Strangers*) (171 defendants).

9.   Title 17 of the United States Code (the "Copyright Act"), specifically 17 U.S.C. § 412 ("Section 412"), expressly forbids awards of statutory damages and attorney's fees (collectively, "Ineligible Remedies") that Defendants claim a right to enforce against members of the Class.

10.   In the Copyright Scheme before this Court, once DGW/USCG secured Achte's business, Dunlap procured copyright registration for *Far Cry* on behalf of Achte under false pretenses by intentionally submitting materially false information in the application.

11.   DGW, USCG, Dunlap and Achte knew the actual publication history of Achte's film on (and at all relevant times prior to) January 19, 2010, the effective date of copyright registration ("Effective Date") when Dunlap's registration application was completed. Dunlap, who has written articles on Section 412 and its impact on foreign rights, knew that it would bar any claims for Ineligible Remedies against any earlier infringers if he stated the truth.   So where the application form requests the film's date and nation of publication (as required by Section 409(8)), Dunlap did not fill in:

• October 2, 2008 and Germany (the global theatrical premiere);

• December 17, 2008 and the United States (the domestic theatrical premiere); or

• April 14, 2009 and the Netherlands (the first publication of *Far Cry* on DVD).

Instead, he claimed that *Far Cry*'s first publication took place on November 24, 2009, in the United States: the date the DVD was commercially released in America.

12.   Each Defendant in the Copyright Scheme had improper economic and business reasons to make this and other knowing misstatements of material information—to maximize the damage awards that Defendants could pursue, the claims for Ineligible Remedies they

could threaten in demand letters, and the volume and amount of extorted "settlements" that would result and in which they could share.

13.   Using the *Far Cry* copyright registration to provide a patina of legitimacy to their Copyright Scheme, Defendants made baseless threats in demand letters Kurtz sent to members of the Class (the "Letters").  The Letters falsely claim that the law allows Achte to seek extraordinary forms of relief, namely statutory damages and attorney's fees, for infringing Achte's copyright for the motion picture *Far Cry*, despite the fatal defects in its registration and the express provisions of the Copyright Act.

14.   The Letters direct recipients to settlement websites which suggest seeking counsel, but warn that even consulting an attorney will almost always cost more than settling,

15.   The Letters, and other communications and actions made by Defendants in the Copyright Scheme, are designed to facilitate "settlements" on wrongful terms.   They confront accused infringers with the financial and logistical burdens of defending themselves in a remote foreign jurisdiction, threats of liability for as much as $150,000 plus attorney's fees, and a warning that settling would be cheaper than retaining an attorney to fight.

16.   The Class consists of a total of 4,577 individuals, including Plaintiff, and contains two proposed Subclasses.  Defendants allege that the members of the Class violated Achte's copyright in *Far Cry*.

17.   The first proposed subclass ("Subclass I") consists of 917 individuals, by whom Defendants alleged infringements that commenced prior to November 24, 2009, which Dunlap claimed in the registration application as the date of *Far Cry*'s first publication.

18.    Under 17 U.S.C. § 412(1), no award of statutory damages or of attorney's fees may be made for infringements that commence before the registration of an unpublished work. Yet Defendants allege that each Subclass I member infringed *Far Cry* when the motion picture was as yet unregistered and, they claim, unpublished.  Each claim by Defendants to obtain Ineligible Remedies from members of Subclass I contravenes the law and is fraudulent.

19.    The second proposed subclass ("Subclass II") consists of 3,644 individuals, including the 917 in Subclass I and 2,727 other individuals including Plaintiff, by whom Defendants alleged infringements that commenced prior to January 19, 2010, the effective date of copyright registration (the "Effective Date").  *Far Cry*'s actual first publication date was at least as early as April 14, 2009, more than nine months before the Effective Date.

20.    Under 17 U.S.C. § 412(2), no award of statutory damages or of attorney's fees may be made for infringements that commence after a work's first publication, but before the registration's effective date, unless the registration is made within three months of the first publication.   Yet the only infringements that Defendants allege by members of Subclass II commenced prior to the Effective Date, which was more than three months after the first publication of *Far Cry*.   Each claim by Defendants to obtain Ineligible Remedies from members of Subclass II contravenes the law and is fraudulent.

21.    Under 17 U.S.C. § 410(b), the Register of Copyrights must refuse registration to any claim that she determines is invalid.  Under its Office Practices, the Copyright Office will not accept an applicant's bare statement as to date or nation of first publication if it has contrary information.   Under 17 U.S.C. § 411(b), a registration certificate that contains

inaccurate information does not satisfy the requirements of Section 412, and thus cannot support an award of Ineligible Remedies, if (A) that information was included on the application with knowledge that it was inaccurate, and (B) its inaccuracy, if known, would have caused the Register of Copyrights to refuse registration.

22.     If Achte and Dunlap had not withheld the truth about this material information, the Copyright Office would have known that the claimed date was invalid, and would have refused to issue a registration showing the false date, according to its Office Practices. The registration that Achte and Dunlap obtained by knowing misstatements of material information relied on by the Copyright Office—in short, by fraud—is invalid.   Each claim by Defendants to obtain Ineligible Remedies from any member of the Class based on that registration contravenes the law and is, like the registration, fraudulent.

23.     Nonetheless, Defendants have sought to coerce settlements from the Class members through the Letters and other communications on the basis of expressly barred claims. Many members of the Class and its proposed subclasses, responding to Defendants' false claims, have been successfully extorted.  They have paid settlements of $1,500 or more and/or made other expenditures, unaware of the fraudulent registration and the deception critical to the Copyright Scheme's impact.    Threatening Ineligible Remedies, the Defendants took advantage of the Class members' shallow pockets and ignorance about their potential defenses, and a discovery lawsuit filed in a jurisdiction far from where most Class members reside, in order to induce them into settling. Absent Defendants' false registration, false threats, and extortionate tactics, these four-figure "settlements" would not have happened.

24.     Defendants' Copyright Scheme is predicated on fraud—upon Plaintiff and the Class, and

        upon the ISPs, the United States Copyright Office, and the United States District Court

        for the District of Columbia.

25.     In this action, Plaintiff and the Class seek to recover damages incurred from Defendant's

        unlawful acts and practices, and injunctive relief to stop the Copyright Scheme.

                              **JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. §

        1332(d), which confers federal jurisdiction over class actions where, as here, "any

        member of a class of plaintiffs is a citizen of a State different from any defendants" and

        the aggregated amount in controversy exceeds $5,000,000. *See* 28 U.S.C. §§ 1332(d)(2)

        and (6).   Plaintiff Shirokov is a citizen of Massachusetts, while Defendants include

        citizens of Virginia, 28 U.S.C. § 1332(d)(2)(A), the United Kingdom and Germany, 28

        U.S.C. § 1332(d)(2)(C).  The amount in controversy exceeds $5,000,000 in aggregate, 28

        U.S.C. § 1332(d), as Defendants collectively, and specifically Achte, USCG, DGW,

        Dunlap and Kurtz, have sought settlements of $1,500 or greater from the 4,577 members

        of the Class; and upon information and belief, members of the Class have spent more

        than $5,000,000 in aggregate in coerced settlement payments, attorney's fees, and other

        costs as a direct result of Defendant's wrongful acts.

27.     This Court also has original jurisdiction under 28 U.S.C. §§ 1331, 1338(a) and (b), and

        1367(a) because this action arises under the Constitution, laws, or treaties of the United

        States.   Specifically, this action arises under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961 *et seq.*; the Copyright Act, 17 U.S.C. §§ 101 *et seq.*; and the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

28.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, because all other claims are so related to those claims over which the Court has original jurisdiction as to form part of the same case or controversy under Article III of the United States Constitution.

29.     Personal jurisdiction comports with due process under the United States Constitution and the long-arm statute of Massachusetts, Mass. Gen. Laws ch. 223A, § 3.  and Defendants, either directly or through other Defendants as agents, systematically and continually conduct business throughout the Commonwealth of Massachusetts, including monitoring the Internet usage of, and/or directing Letters and other communications to, Massachusetts residents including Plaintiff.

30.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to the claim occurred in this District.

31.     Defendants have no legitimate basis for claiming that jurisdiction would be appropriate in the United States District Court for the District of Columbia.  Plaintiff does not have the requisite minimum contacts with the District of Columbia,[2] nor has he purposefully availed himself of jurisdiction therein.

---

[2] Fishing for a connection between Class members and the District of Columbia to support jurisdiction in the Achte action, Defendants have argued that some of the 4,577 alleged infringing acts *may* have taken place in that District, an insufficient ground for jurisdiction over any particular allegation. See, e.g., Omnibus Motion & Memorandum to Quash Subpoena Pursuant to Fed. R. Civ. P. 45(C)(3) and Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(2) at pp. 12-18, No. 10-453 (D.D.C. Sep. 10, 2010); Plaintiff's Statement of Good Cause in Response to Court Order at pp. 9-10, No. 10-10453 (D.D.C. Sept. 28, 2010) (offering speculative bases for possible jurisdiction).

**PARTIES**

32.    Plaintiff Dmitriy Shirokov ("Plaintiff") is a citizen of Middlesex County, Massachusetts.

33.    Defendant Dunlap, Grubb & Weaver PLLC ("DGW") is a Virginia law firm with its main office at 199 Liberty Street SW, Leesburg, Virginia 20175, and offices at 1200 G Street NW, Washington, DC 20005 and 1934 Old Gallows Road, Vienna, Virginia 22182.

34.    Defendant US Copyright Group ("USCG") is a Virginia corporation with a principal office at 199 Liberty Street SW, Leesburg, Virginia 20175.  USCG is a registered alias for a partnership between DGW and GuardaLey.  USCG is also a registered alias of several corporations with ties to DGW.

35.    Defendant Thomas Dunlap ("Dunlap"), an attorney, is a managing partner at DGW and USCG.

36.    Defendant Nicholas Kurtz ("Kurtz") is an attorney at DGW.

37.    Defendant GuardaLey, Limited ("GuardaLey") is a German company incorporated in England and Wales with its principal office at 5 Jupiter House, Calleva Park, Aldermaston, Reading, Berkshire, RG7 8NN, United Kingdom.  GuardaLey is a partner with DGW in managing USCG.

38.    Defendant Achte/Neunte Boll Kino Beteiligungs Gmbh & Co KG ("Achte"), a motion picture creator and/or distributor, is a Kommanditgesellschaft, or German Limited Partnership, with its principal place of business at Wormserstrasse 173, D-55130 Mainz, Germany.

## LEGAL BACKGROUND

39.   Under United States law, copyright attaches to original works of authorship, including artistic works such as movies, upon their creation.[3]

40.   Copyright law grants copyright holders certain exclusive rights, including the right to reproduce, distribute, and publicly perform the work, violation of which may constitute copyright infringement.[4]

41.   The United States has a voluntary system of copyright registration, allowing the owner of a copyright or any exclusive right in a work to submit an application to the Copyright Office.  Registration is permissive, but it is not a condition of copyright protection.[5]

42.   The Copyright Act establishes remedial incentives to encourage copyright holders to register their works.[6]   In case of copyright infringement litigation, properly registered works enjoy statutory benefits, including:

•   Enforcement in federal court is available for "United States works." [7]

•   Statutory damages awards of between $750 and $30,000 are available for each infringed work.[8]

---

[3] 17 U.S.C. § 102.

[4] 17 U.S.C. § 106.

[5] 17 U.S.C. § 408(a).

[6] *Reed Elsevier v. Muchnick*, 559 U.S. ____, 130 S. Ct. 1237, 1241 n. 1 (2010).

[7]  17 U.S.C. § 411(a). "Works first published outside the United States ... are exempt from the registration requirement, § 411(a), unless the copyright holder seeks statutory damages and attorney's fees."  *Rudnicki v. WPNA 1490 AM*, 580 F. Supp. 2d 690, No. 04-C-5719 (N. D. Ill. July 24, 2008).

[8] 17 U.S.C. § 504(c)(1).

- Statutory damages awards of up to $150,000 are available for each infringed work if the infringement was committed willfully.[9]

- The prevailing party in litigation may recover attorneys' fees and court costs.[10]

- An injunction may be imposed against a copyright infringer.[11]

43.   The Copyright Act provides more limited remedies in certain circumstances.   When an infringement commences prior to registration, statutory damages and attorneys' fees are not available as remedies for infringement of any copyrighted work that was published more than three months prior to its registration.[12]

44.   Section 412 of the Copyright Act provides in full:

### 17 U.S.C. § 412: Registration as prerequisite to certain remedies for infringement

In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a), an action for infringement of the copyright of a work that has been preregistered under section 408(f) before the commencement of the infringement and that has an effective date of registration not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the infringement, or an action instituted under section 411(c),[13] no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—

---

[9] 17 U.S.C. §§ 504(c)(2).  However, a court may reduce a statutory damages award to as little as $200 in a case of "innocent infringement"—that is, where the infringer was not aware and had no reason to know that his or her acts constituted infringement of copyright.  Id.

[10] 17 U.S.C. § 505.

[11] 17 U.S.C. § 502.

[12] 17 U.S.C. § 412(2).

[13] The statutory exceptions to Section 412 are not applicable to Defendants' claims, because the civil action DGW filed on behalf of Achte was not (a) brought under Section 106A(a) (the Visual Rights Act of 1990, Pub. L. No. 101-650); (b) based on a preregistered work under Section 408 (f); nor (c) instituted under Section 411(c) (which allows claims on behalf of live televised broadcasts).

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

45.     The Copyright Act defines the "publication" of a work as follows:

Publication is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display constitutes publication. A public performance or display of a work does not of itself constitute publication.[14]

46.     The Copyright Office further explains that, "when copies or phonorecords are offered for sale or lease to a group of wholesalers, broadcasters, or motion picture theaters, publication does take place if the purpose is further distribution, public performance, or public display."[15]

47.     There are several grounds for protection of published works (including motion pictures) under the Copyright Act, including if "the work is first published in the United States or in a foreign nation that, on the date of first publication, is a treaty party."[16]

48.     An application for a registration of copyright in a published work requires a statement of the date of first publication; the nation of first publication should also be given.[17] Specifically, under the Copyright Office's guidelines an application covering a work first

---

[14] 17 U.S.C. § 101.

[15] U.S. Copyright Office, Circular 1, Copyright Basics, p. 4, available at http://www.copyright.gov/circs/circ01.pdf.

[16] 17 U.S.C. § 104(b)(2).

[17] 17 U.S.C. § 409(8); U.S. Copyright Office, Compendium II: Copyright Office Practices ("Compendium II") §§ 621, 910.

published outside the United States should state the date of first publication there, and should be accompanied by a copy or phonorecord of the foreign edition as first published.[18]

49.    The Copyright Office's manual of practices and procedures states its general practices with respect to publication, including that,

> Where the applicant is uncertain as to which of several possible dates to choose, it is generally advisable to choose the earliest date, to avoid implication of an attempt to lengthen the copyright term, or any other period prescribed by the statute.

U.S. Copyright Office, Compendium II: Copyright Office Practices, Section 904.

50.    The Copyright Office ordinarily does not make findings of fact with respect to publication.[19]   Instead, it will generally accept without question the date and nation of first publication given by the applicant:

> The Office will correspond with the applicant if it has information inconsistent with the statement used by the applicant as the basis for the date given. Similarly, the Copyright Office will generally accept the statement of the applicant on nation of first publication, unless it appears to be clearly inconsistent with the facts stated by the applicant or the information which the Office has with respect to the place of first publication.[20]

51.    However, if the Copyright Office has information (whether provided by the applicant or not) clearly inconsistent with the applicant's statement, it will not generally accept the statement.[21]

---

[18] Compendium II § 910.09.

[19] Id. § 108.05.

[20] Id. § 910.01.

[21] Id.

52.     The Copyright Office will not register an invalid claim.[22]

53.     In short, the Copyright Office will not register a claim if it has information that the date
        and nation of first publication listed on the application are incorrect.

54.     A certificate of registration from the United States Copyright Office is prima facie
        evidence of a copyright's validity.[23]

55.     However, such evidence may be rebutted with evidence that the registration was obtained
        through fraud or material misrepresentations or omissions.

56.     An applicant who knows that the copyright certificate of registration contains inaccurate
        information cannot use it as a basis for a civil action for infringement if the inaccuracy
        would have caused the Register of Copyrights to refuse registration.[24]

**STATEMENT OF FACTS**

**A.      DGW Purports to Have Special Expertise in Copyright Law.**

57.     Defendant law firm DGW holds itself out as having special expertise in intellectual
        property law, and in copyright law specifically.   This is not limited to its self-branded
        alias as "US Copyright Group" ("USCG").

58.     The home page of the DGW website declares, "We are a boutique law firm that handles
        intellectual property prosecution, litigation and business law matters on a national and
        international scale."[25]   DGW's web page detailing the firm's copyright services declares
        its lawyers "uniquely qualified" in the field, emphasizing the firm's proximity to the U.S.

_____

[22] 17 U.S.C. § 410(b); Compendium II §§ 108.09, 606.

[23] 17 U.S.C. § 410(c).

[24] 17 U.S.C. § 411.

[25] See http://www.dglegal.com (last visited Nov. 21, 2010).

Copyright Office, its practice "counseling clients to obtain protection and rights to use and profit from copyrighted material," and its "extensive experience negotiating and drafting agreements involving copyrighted works."[26]   Announcing one of its film copyright lawsuit filings in 2010, the firm declared on its blog page, "we have a team of intellectual property lawyers who are experienced in prosecuting these cases."[27] True and correct copies of these DGW web pages are attached as Exhibit A.

59.   DGW specifically portrays itself as well-versed in copyright law, including the law regarding copyright registration.  Advertising the firm's copyright registration services, the DGW website includes two separate forms (an "intake form" and a "questionnaire"); a prospective client may fill out either to authorize DGW to handle their copyright registration.[28]

60.   The intake form assures prospective clients of DGW's intellectual property specialization:

> We are confident that you will find our online application process easy to use, and be assured that your application will be submitted by actual intellectual property attorneys who can and will be there for you in the future to assist with the registration process, as the need arises.

See Exhibit B.

_____

[26] See http://www.dglegal.com/services/intellectual-property/copyright (last visited Nov. 21, 2010).

[27] http://www.dglegal.com/dgw-blog/copyright-holders-fight-back.html (last visited Nov. 21, 2010).

[28] See http://www.ustrademarkgroup.com/DGW__-_File_A_Copyright.html (last visited Nov. 14, 2010) (the "intake form'); and http://ustrademarkgroup.com/uploads/ DGW_Copyright_Engagement___350_or__1_000_.pdf (last visited Nov. 14, 2010) (the "questionnaire"). True and correct copies of the intake form and questionnaire are attached as Exhibits B and C, respectively.

**B.** **DGW and Dunlap Have Demonstrated an Acute Awareness of the Significance of Section 412 of The Copyright Act.**

61.     The intake form also recognizes that the date and nation of a work's first publication are

material information in a copyright registration, asking of applicants:

> If the material has been published or publicly distributed, please give the date of
> the first publication or earliest distribution and the nation of the first publication
> or earliest distribution.

See Exhibit B, Section 8.

62.     The questionnaire poses the question of first publication more elaborately:

> Have copies of this work been publicly distributed or given to another for
> purposes of distribution to the public? If so, please describe the circumstances,
> and give the date (month/day/year) when this first occurred, and the location.

See Exhibit C.

63.     This questionnaire suggests DGW's acute awareness of how Section 412 affects the value

of a copyright claim against infringers.  Atop the questionnaire, DGW informs potential

clients,

> Substantive rights may be established as of the filing date of a US copyright
> application, particularly within ninety days of publication or before actual
> infringement occurs.

Id.  This passage references the statutory benefits to registering copyright before any

infringement occurs, or within the Section 412 safe harbor, which allows a copyright

owner to seek the full range of remedies against infringers even if the work has already

been published, as long as it is registered within three months after publication.

64.     For years, Defendant Dunlap has been personally aware of the bar on statutory damages

imposed by Section 412.

17

65.    In 2009, Dunlap posted the following comment in the "Free Legal Advice" section of the

website Avvo.com:

> Under the Berne Convention (the US joined in 1989) you have a common law
> right to protection, however in order to potentially recover statutory and punitive
> damages you need to register your copyright immediately (happy to help) as you
> generally only have 90 days from the date of the infringing publication to do so
> (17 USC 412). Get to a lawyer today and register that copyright with the US
> Copyright Office ASAP![29]

66.    In 2007, Dunlap discussed the significance of Section 412 at length in an online article

entitled, "Intellectual Property Primer for CEOs, Managers, and Corporate

Counsel" ("Primer").[30]  A true and correct copy of the Primer is attached as Exhibit E.

67.    In the Primer, Dunlap generally sought to distinguish copyrights and trademarks under

American law and discuss the benefits of registration.[31]    Discussing copyright law,

Dunlap wrote in the Primer, "[w]ith out registration you can be awarded actual damages

and lost profits only." See Exhibit E.

68.    At several points in the Primer, Dunlap focused on an issue that USCG would later make

a selling point to its prospective clients: the possibility of settlements far in excess of

actual damages.

---

[29] Posting of Thomas M. Dunlap, tdunlap@dglegal.com, to http://www.avvo.com/legal-answers/
lyrics-dspute--134378.html (last visited Nov. 8, 2010).  A true and correct copy of the posting is
attached as Exhibit D.

[30] Thomas M. Dunlap, Intellectual Property Primer for CEOs, Managers, and Corporate Counsel
(Aug. 19, 2007), available at http://www.hg.org/article.asp?id=4788.   Though the byline above
the article states that the article was written by DGW, the author bio below the article specifically
identifies Dunlap as the author.

[31] "The most important thing that an executive needs to know at the end of the day, is that
registration of both trademark/ brand names and of copyrightable material is important."  Id.

69.     In describing the value of copyright registration, Dunlap highlighted details of the only specific case law discussed in his Primer:

> Other advantages of registering [a copyright], just like trademark there is a public notice of the ownership of the work. You can't collect your attorney's fees and statutory damages (of up to $150,000 per incident!) if you have not registered. A good example of that is the case where someone wrote a thesis as part of a doctoral program [] didn't publish it, filed it with his University. Another person copied the thesis word for word, punctuation for punctuation, published it with a book publisher and sold it at Barnes and Noble, Amazon, every large bookseller you could think of about ten years later. The person waited too long after the infringing publication to copyright the work and was reduced to making common law claims. It turns out the profits from the sales of that book were about a thousand dollars, well under the amount of the tens of thousands of dollars in attorneys fees required to enforce the matter. So the registration was really important there, as a practical matter.

See Exhibit E.

70.     Dunlap reiterated the value of registration toward the end of the Primer:

> You have common law right as soon as you use a trademark in Commerce, or as soon as you put the original work of authorship in a tangible medium. However, until you have actually gone through the registration process, until you have vetted the trademark to make sure that you are not infringing, the common law rights are practically worthless as the exercise of this protection often fails a cost benefit analysis....
>
> We recommend that businesses protect anything they can get their intellectual property claws on. The cost of litigation are high. If you haven't registered your trademark or copyright, then you're eating that cost of enforcement even if you win. Ten dollars of prevention is worth ten thousand dollars in legal fees.

Id.

71.     Soon after publishing this Primer, Dunlap, Weaver, and others at DGW developed a new way for businesses to "get their intellectual property claws on" alleged infringers.

C.   **DGW's US Copyright Group Facilitates a Business Model Based on Volume Settlements of Alleged Copyright Infringement.**

72.   DGW does business under the alias "US Copyright Group."  Documents on file with the Virginia State Corporation Commission indicate that DGW registered "US Copyright Group" as a fictitious name.[32]   DGW, in conjunction with Defendant GuardaLey, manages and does business as USCG.  At least one of the managers of USCG, Benjamin Perino, is also a managing director of GuardaLey.[33]  Jeffrey Weaver, a name partner at DGW, filed the application for trademark registration for the service mark "US Copyright Group."  On LinkedIn.com, Dunlap's public profile page identifies him as a USCG partner and co-founder, and features a hyperlink to one of USCG's settlement websites, www.savecinema.org, under the heading "Company Website."[34]   The USCG page on LinkedIn lists DGW's Washington, D.C. office as USCG's headquarters with Dunlap as its main contact.[35]

---

[32]  Virginia State Corporation Commission, Dunlap, Grubb & Weaver, PLLC, LLC ID No. S244979-3 (Nov. 10, 2009).

[33]  See Declaration of Benjamin Perino in Support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference, ¶ 1, No. 10-453 (D.D.C. Mar. 18, 2010) ("I am one of four Managers of the US Copyright Group ...") and Public Comment Letter from Jean M. Prewitt, Indep. Film & Television Alliance to U.S. Intellectual Prop. Enforcement Coordinator, App. D. p. 6 (Mar. 24, 2010) (identifying Perino as Managing Director of GuardaLey), available at http://www.whitehouse.gov/sites/default/files/omb/IPEC/frn_comments/IndependentFilmTelevisionAlliance.pdf (last visited November 8, 2010).

[34]  LinkedIn, Thomas Dunlap Public Profile, http://www.linkedin.com/in/tomdunlap (last visited Nov. 20, 2010).

[35]  LinkedIn, US Copyright Group Public Profile, http://www.linkedin.com/company/us-copyright-group (last visited Nov. 20, 2010).

73.  Under its USCG moniker, DGW has "turned P2P prosecution into revenue generation in order to 'SAVE CINEMA.'"[36]

74.  In the face of increasing concern over Internet infringement, USCG offers the film industry a new revenue stream: a share of the proceeds from "litigation settlement" demand letters with accusations that the recipient has engaged in peer-to-peer copyright infringement online and threats to pursue damages awards of up to $150,000 if the accused doesn't settle within a few weeks.

75.  DGW/USCG has actively solicited film production and distribution companies to join in its scheme to turn infringement claims into a windfall.  "The model couldn't be simpler: find an indie filmmaker; convince the production company to let you sue individual 'John Does' for no charge; send out subpoenas to reveal each Doe's identity; demand that each person pay $1,500 to $2,500 to make the lawsuit go away; set up a website to accept checks and credit cards; split the revenue with the filmmaker."[37]

76.  USCG outlined each step of its copyright settlement business model in an online solicitation to potential clients posted on one of its websites, www.savecinema.org:

> ... AT NO COST TO OUR CLIENTS, THE US COPYRIGHT GROUP WILL:
>
> IDENTIFY ILLEGAL DOWNLOADERS BY ISP ADDRESS
>
> SUBPOENA IDENTIFYING CONTACT INFORMATION
>
> SEND A CEASE & DESIST LETTER TO DEMAND PAYMENT OF DAMAGES

---

[36] Nate Anderson, "The RIAA? Amateurs. Here's how you sue 14,000+ P2P users," ars technica (June 2010) (available at http://arstechnica.com/tech-policy/news/2010/06/the-riaa-amateurs-heres-how-you-sue-p2p-users.ars) (last visited Nov. 22, 2010).

[37] Id.

OBTAIN SETTLEMENT OF APPROXIMATELY $500 - $1,000 PER INFRINGER & PROMISE TO CEASE FUTURE ILLEGAL DOWNLOADING

PROCESS SETTLEMENTS & PROVIDE RECORDS TO THE CLIENT

DISBURSE CLIENT'S PORTION OF THE DAMAGES

ALL SERVICES PROVIDED ON A CONTINGENCY OR FLAT-FEE BASIS AT NO COST TO THE CLIENT[38]

77.   As this solicitation shows, USCG and its clients envision the relationship as one in which USCG will "obtain settlement" from alleged infringers and "process settlements," splitting the proceeds with the client, who is charged nothing.

78.   Under the heading "Capital Recovery," USCG's website further explained to potential clients the logic behind its avoidance of actual prosecution of individual claims:

Copyright infringement and the Federal and state laws surrounding its enforcement are complex and difficult to implement, which means that the solutions are complex and the legal fees are expensive. More than any other industry, the film and entertainment industry loses prodigious amounts of revenue to the world of illegal downloading, uploading and file-sharing. *As a practical matter each individual infringer lacks the assets, net worth and earning capacity to make civil prosecution practical* ... until the SaveCinema.org efforts of the US Copyright Group.[39]

79.   USCG promotes a cost-benefit analysis in which alleged infringers are generally not worth suing.   USCG steers film studios away from litigation and toward mass settlements.

80.   On its LinkedIn page, USCG further expands upon its goals:

---

[38] SaveCinema.org - Solutions; http://www.savecinema.org/index-3.html (as of Nov. 19, 2009), filed with the United States Patent and Trademark Office as a specimen of use in the application for the trademark "US COPYRIGHT GROUP" [Registration No. 3779792]. A true and correct copy of the specimen pages in the trademark application is attached as Exhibit F.

[39] Id. (emphasis added).

> Our unique partnerships allow us to monitor filing sharing [*sic*], uploads and downloading. Then, we obtain the infringers' identities through ISP subpoenas, finally resulting in "cease & desist" letters with a demand for payment of damages being sent to the illegal downloaders *on a massive scale*. Research suggests that *once a copyright infringer is forced to pay settlement damages far in excess of the actual cost of the stolen content*, he will never steal copyrighted material again.[40]

81.   In this mission statement, USCG explains that its copyright settlement business model is predicated on *settlements far in excess of any actual damages suffered*.

82.   In practice, the USCG mass settlement business model proceeds by these steps:

(1) monitor file sharing, logging incidents of alleged infringement of client copyrights,

(2) file suit against unnamed accused infringers ("John Doe defendants") en masse,

(3) obtain court approval to issue third-party subpoenas to ISPs,

(4) collect contact information for John Doe defendants from ISPs,

(5) send letters to John Doe defendants threatening damages, and

(6) collect and distribute settlement payments.

83.   Defendants have collectively and systematically executed the mass settlement business model advertised by USCG against thousands of John Doe defendants.

84.   Dunlap's Primer was addressed to "CEOs, Managers, and Corporate Counsel" who might have copyrights and trademarks to register. Dunlap offered such prospective clients a theme that also features in USCG's client recruitment materials: that infringement trials are expensive but rare, while settlements are fast and common:

> These matters often resolve prior to a final trial in the form of a settlement agreement or licensing agreement. Federal courts like settlement, judges don't want to hear cases that can settle. Failing that, you have to go through the

---

[40] LinkedIn, US Copyright Group company page, http://www.linkedin.com/company/us-copyright-group?trk=null (emphasis added) (last visited November 8, 2010). A true and correct copy of the LinkedIn page is attached as Exhibit G.

litigation process. ...

Typically speaking to prosecute or defend a trademark or copyright claim, you are looking at spending anywhere from fifty to a hundred thousand dollars at the typical simple end of the spectrum. A complex more valuable trademark could cost more to prosecute and defend, because of the value of the mark defendant may be willing to spend more to defend its actions and plaintiffs may be willing to spend more to enforce. It is a cost benefit analysis on both sides - is the mark is an essential part of the business? How much has the company spent on the mark and making in known to the public or in the industry? What happens if the business suddenly loses the mark?

Can it cost less? Certainly, you could file a complaint and have a licensing agreement or settlement two weeks later, or you could send an infringement letter, and have a license agreement or settlement letter without even filing a complaint. Facts often win cases in advance and there is a lot less risk to both parties in settlement. In fact it is rare when parties don't settle outside of court.[41]

85.   Tactics that Dunlap promoted (encouraging settlement and discouraging litigation) also benefit DGW in the USCG cases, as per the cost-benefit analysis it promotes to clients.

86.   DGW's direct stake in USCG's proceeds gives it a financial incentive to maximize its reward by obtaining as many settlements as possible for as much money as it can get.

87.   DGW is not built to handle, as individual claims, anywhere near the volume of copyright litigation it has threatened. DGW lists a total of thirteen attorneys on its website.[42] The small number of attorneys at DGW belies any claim that it honestly intends to pursue full-blown litigation against any more than a small fraction of the John Doe defendants.

88.   Defendants also seek to achieve economies of scale and minimize costs through a cookie-cutter litigation model: DGW uses form texts for complaints, motion papers, third-party subpoenas, and threatening letters sent to thousands of defendants across its film

_____

[41] Exhibit E.

[42] See http://www.dglegal.com/attorneys (last visited Nov. 21, 2010).

copyright infringement cases, inserting case-specific information into template documents.

      **D.**    **Achte's Failure to Timely Register Its Copyright for *Far Cry* Posed a Problem for the USCG Business Model, Which Dunlap Sought to Mask Through Fraud.**

89.    Defendants' cookie-cutter litigation tactics are not appropriate in cases that do not raise identical issues. But as Defendants knew, the Achte action was not like their other cases.

90.    To date, *Far Cry* is the only foreign film to serve as the basis for DGW/USCG litigation. Achte is a German film production company that has made over twenty feature-length motion pictures.  Upon information and belief, the copyright for each of those motion pictures prior to *Far Cry* had been duly registered with the U.S. Copyright Office.

91.    Achte was one of the producers of *Far Cry*, a movie based on a video game of the same name.  Uwe Boll, the director of *Far Cry*, has directed several other films based on video games.  Upon information and belief, Uwe Boll is a partner in Achte.

92.    No application for copyright registration had been submitted to the Copyright Office for *Far Cry* at the time Achte first retained DGW and USCG.

93.    DGW submitted the *Far Cry* copyright registration application for Achte.  Upon information and belief, it has not handled the copyright registration process for films underlying its copyright litigation other than *Far Cry*.

94.    *Far Cry* had been published more than three months before its U.S. copyright registration.

95.    As a result, by operation of Section 412, infringements prior to that date are not subject to statutory damages (including damages for willful infringement) or attorney's fees.

Remedies that DGW routinely seeks on behalf of other plaintiffs in its copyright litigation campaign are Ineligible Remedies in the Achte case as to members of Subclass II.

96.    Despite these unusual aspects of the Achte case, DGW tried to make it fit the mold.

97.    *Far Cry* was filmed in Canada in the summer of 2007, with dialogue in English.

98.    *Far Cry* was first released in theaters in Germany on October 2, 2008.[43]  It premiered on over 200 different screens in its first week of release.

99.    *Far Cry* was first released in United States theaters on December 17, 2008.[44]

100.   The first publication of the film on DVD was no later than April 14, 2009, when the DVD was offered for sale to the public by commercial release in the Netherlands. See Exhibit H.

101.   The DVD was again published in the United Kingdom, where it was offered for sale to the public by commercial release on September 7, 2009.[45]

102.   Again, in Italy, on October 14, 2009, the DVD was offered for sale to the public by commercial release.[46]

103.   The film was commercially released on DVD in both the United States and Canada on November 24, 2009.  See Exhibits H and I.

---

[43] See The Internet Movie Database, *Far Cry* (2008) Release Dates, http://www.imdb.com/title/ tt0400426/releaseinfo (last visited Nov. 15, 2010); Wikipedia, *Far Cry* (film), http:// en.wikipedia.org/wiki/Far_Cry_(film) (last visited Nov. 15, 2010).  True and correct copies of these Internet Movie Database and Wikipedia pages are attached as Exhibits H and I, respectively.

[44] Id.

[45] See id.

[46] See id.

104.    That history posed a problem for DGW/USCG when it was first retained by Achte. Dunlap was aware that filing a copyright registration so long after publication would prevent Achte from obtaining the Ineligible Remedies for any pre-registration infringements.   An honest registration would have cut into the potential settlement proceeds that Achte and USCG could share.

105.    In its USCG work, DGW attempts to maximize its intake of settlement proceeds, while minimizing protracted legal battles that will require significant time investments and legal risk.

106.    Because *Far Cry* was first published outside of the United States, Achte would have standing to bring claims for copyright infringement even absent a registration.  But such claims would be limited to actual damages.

107.    The USCG business model is less lucrative if the Ineligible Remedies are not available. As Dunlap stated in his Primer, "until you have actually gone through the registration process … the common law rights are practically worthless as the exercise of this protection often fails a cost benefit analysis." See Exhibit E.

108.    The registration certificate would not support Achte's claim for Ineligible Remedies if it accurately represented the *Far Cry* publication history.

109.    Dunlap sought to resolve this problem by perpetrating fraud upon the Copyright Office.

110.    Dunlap submitted a registration application for *Far Cry* that falsely claimed a first date of publication of November 24, 2009.

111.    The Copyright Office issued a registration certificate for the copyright of *Far Cry*.  A true

and correct copy of the registration certificate is attached as Exhibit J. The certificate,

based on information in Dunlap's filing, discloses the following:

(1) the registration number, PA 1-658-618;

(2) the motion picture was created in 2007;

(3) the motion picture was first published on November 24, 2009, in the United States;

(4) the motion picture had not been previously published;

(5) no material in the motion picture was excluded from the copyright claim as

previously registered or published;

(6) the Effective Date of registration was January 19, 2010;[47]

(7) neither the registered work nor any earlier version was registered prior to the

Effective Date;

(8) Achte's claimed authorship of the work, the entire motion picture, as "employer-for-

hire"; and

(9) Dunlap's contact information, listed for any parties seeking rights and permissions.

112.    Material falsehoods in the copyright registration that Dunlap secured for *Far Cry* are fatal

to DGW's claims that Achte is entitled to seek Ineligible Remedies in litigation to enforce

that copyright.

113.    When DGW began soliciting film studios as USCG in late 2009, Achte had already

missed out on the benefits of Section 412.   The motion picture had been published

through theatrical release no later than October 2, 2008.  The DVD of the motion picture

---

[47] See 17 U.S.C. § 410(d).

had been released no later than April 14, 2009.  Neither version had been registered with the Copyright Office.

114.   Upon information and belief, Defendants knew that the *Far Cry* DVD had been previously published in at least one foreign country more than three months before Dunlap filed a copyright registration application on behalf of Achte, in which he claimed that the domestic release date of the DVD was its first date of publication, and that the United States was its first nation of publication.

115.   Upon information and belief, Dunlap knew that he was required to state the earliest actual publication date worldwide on the Copyright Office registration form.

116.   Dunlap—an attorney who holds himself out as an expert in copyright law—should have known that he was required to state the earliest actual publication date worldwide on the Copyright Office registration form.

117.   The intake form on DGW's web page includes a request that prospective copyright applicants provide the following information:

> **If the material has been published or publicly distributed, please give the date of the first publication or earliest distribution and the nation of the first publication or earliest distribution.[48]**

118.   In applying for the *Far Cry* copyright, Dunlap made assertions of fact that were false in precisely the manner proscribed by DGW when instructing its prospective clients on how to apply for copyright registration.

119.   Copyright Office registration forms include a recitation of 17 U.S.C. § 506(e), and require applicants to sign a certification as follows:

---

[48]   See http://www.ustrademarkgroup.com/DGW__-_File_A_Copyright.html (last visited Nov. 14, 2010) (the "intake form'). See Exhibit B. (emphasis in original).

> 17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
>
> I certify that I am the author, copyright claimant, or owner of exclusive rights, or the authorized agent of the author, copyright claimant, or owner of exclusive rights, of this work, and that the information given in this application is correct to the best of my knowledge.

U.S. Copyright Office, Form CO, Application for Copyright Registration. A true and correct copy of Form CO is attached as Exhibit K.

120. Despite the false statements in his application, Dunlap made this certification on behalf of Achte on January 18, 2010.

121. In practice, the Copyright Office typically accepts an applicant's statement as to the date and nation of first publication.[49]  It is this practice that Dunlap relied on when he falsified the registration.

122. Dunlap was well aware of this practice prior to the *Far Cry* registration.  In his Primer, Dunlap contrasted the review of examining attorneys at the United States Patent and Trademark Office for trademarks with what he depicts as an absolute lack of examination for copyrights:

> Copyright registration is a simpler and much less expensive process. Unlike trademark registration, a copyright filing is not examined by anyone. As long as the proper procedures are followed the copyright is registered and the filing party gets federal copyright protection.
>
> ... Copyright is a little bit different then trademark, in that the copyright office just registers your copyright. They don't look at other copyrights to see if you are infringing on something that is already registered, or if you are plagiarizing

---

[49] Compendium II § 108.09.

something, they just register it. ... The copyright office just takes registration [*sic*] and registers it.[50]

E.  **Defendants Have Used the False Copyright Registration to Provide Illusory Support for their Application of USCG's Standard Mass Settlement Strategy Against Alleged *Far Cry* Infringers.**

123.  Dunlap obtained Achte's copyright registration for *Far Cry* by making false representations of material facts to the U.S. Copyright Office.

124.  Upon information and belief, Dunlap made a false assertion to the Copyright Office of a publication date within three months of the date of application, seeking to obtain for Achte rights that are unavailable under the law for tardy applicants, including the right to seek statutory damages and attorney's fees in subsequent infringement actions.

125.  Absent this falsehood, Defendants could not have plausibly claimed that infringers of *Far Cry* are subject to any Ineligible Remedies, due to the automatic effect of Section 412.

126.  By its plain language, Section 412(2) prohibits any "award of statutory damages or of attorney's fees, as provided by sections 504 and 505" for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

127.  *Far Cry* was first published no later than April 14, 2009, and registered effective on January 19, 2010, more than nine months later.

128.  Because Achte failed to register the copyright for *Far Cry* within three months of its publication, Section 412(2) of the Copyright Act prohibits it from obtaining the Ineligible Remedies "for any infringement of copyright commenced after first publication of the

---

[50] Exhibit E.

work and before the effective date of its registration"—that is, any infringement commenced between April 14, 2009 and January 19, 2010.

129.   Defendants cannot seek statutory damages or attorney's fees from anyone whose infringement "commenced" between those dates.

130.   Aided by the falsely obtained registration, Defendants have claimed to be eligible for the same sort of remedies allowed in other USCG cases.

131.   In the Achte case, Defendants have filed a complaint, motions, and declarations, and employed subpoenas and threatening Letters, that recite verbatim language Defendants use in their other cases.

132.   Achte engaged USCG, and in turn, USCG retained GuardaLey, to document instances of purported infringement of Achte's copyright in the motion picture *Far Cry*.

133.   On March 18, 2010, DGW filed the Achte action: a suit in the United States District Court for the District of Columbia on behalf of Achte against 2,094 anonymous individuals ("John Doe defendants"), alleging infringement of the motion picture *Far Cry*.[51] The original complaint was not signed, but the signature block named Defendants Dunlap and Kurtz,[52] and included Dunlap's phone number and email address.

134.   On the same date, DGW sought leave of court to serve subpoenas on ISPs across the country, to determine the John Doe defendants' names and contact information.[53] The

_____

[51] Complaint for Copyright Infringement, No. 10-453 (D.D.C. Mar. 17, 2010) (the "original complaint"). A true and correct copy of the original complaint is attached as Exhibit L.

[52] The signature block on the original complaint also included two other DGW associates: Ellis Bennett and David Ludwig.

[53] Motion for Leave to Take Discovery Prior to Rule 26(f) Conference, No. 10-453 (D.D.C. Mar. 18, 2010).

court granted permission on March 23, 2010, and DGW began to serve subpoenas on ISPs soon thereafter.

135.   DGW's subpoenas to the ISPs seek contact information (including names, addresses, phone numbers, and email addresses) of ISP subscribers whom DGW claims infringed its clients' copyrights.[54]

136.   When an ISP provides DGW the subpoenaed private subscriber contact information, DGW sends a Letter to the ISP subscribers, describing their status as John Doe defendants and the potential consequences that DGW contends they face.

137.   Among the 2,094 John Doe defendants in the spreadsheet exhibit to Defendants' original complaint were 1,006 individuals listed with an alleged date of infringement prior to November 24, 2009 (i.e., members of Subclass I), and an additional 984 individuals listed with an alleged date of infringement prior to the Effective Date, January 19, 2010. Overall, the 2,094 targets of the original complaint filed on behalf of Achte by DGW, Dunlap, and Kurtz, included 1,990 members of Subclass II.

138.   Plaintiff was one of the members of Subclass II whom Defendants sought to identify in the spreadsheet exhibit to the original complaint.  The exhibit identified Plaintiff as "Doe 1910," listed his Host IP Address as 72.93.84.75, named his ISP (Verizon Internet Services), and alleged an infringement at 3:26:18 AM on December 11, 2009.   Later communications from Defendants to Plaintiff, including the Letter, stated that plaintiff's ISP had identified him as the subscriber with that IP address.

---

[54] Order Granting Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference, No. 10-453 (D.D.C. Mar. 23, 2010).

139.    The original complaint indiscriminately staked a right to pursue statutory damages and attorney's fees from each of the 2,094 John Doe defendants, whether they were among the 95% of alleged infringers within Subclass II (as to whom those were Ineligible Remedies), like Plaintiff, or among the less than 5% of alleged infringers whom Achte claimed infringed after the Effective Date.

140.    The original complaint fails to distinguish between its allegations against pre-registration and post-registration infringers when stating the remedies Achte can seek, as well as in its prayer for judgment.

141.    The original complaint states, "As a result of *each* Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to relief pursuant to 17 US.C. § 504 and to its attorneys' fees and costs pursuant to 17 US.C. § 505." Exhibit L ¶ 14 (emphasis added).

142.    The original complaint states a prayer for judgment "against each Defendant" that includes "actual damages or statutory damages pursuant to 17 U.S.C. § 504, at the election of [Achte]" and "[Achte's] reasonable attorney's fees." Exhibit L, pp. 5-6.

143.    On May 12, 2010, DGW filed a First Amended Complaint for Copyright Infringement ("Amended Complaint") on behalf of Achte, raising to 4,577 the alleged number of infringers of the motion picture *Far Cry*. Dunlap signed the Amended Complaint.  A true and correct copy of the Amended Complaint is attached as Exhibit M.

144.    The Amended Complaint included an Exhibit ("Class List") identifying an ISP and IP address, and the alleged date and time of infringement, for each of the 4,577 alleged infringers in the Class.

145.   Of the 4,577 Class members, the Class List lists 917 (the members of Subclass I) with an alleged infringement date prior to November 24, 2009. Approximately 20% of the alleged infringers listed are in Subclass I, by virtue of the dates on which Defendants allege they committed infringing acts.

146.   The Amended Complaint fails to distinguish between its allegations against pre-registration and post-registration infringers when stating the remedies Achte can seek, as well as in its prayer for judgment.

147.   The Amended Complaint states, "As a result of *each* Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to relief pursuant to 17 US.C. § 504 and to its attorneys' fees and costs pursuant to 17 US.C. § 505."  Exhibit M ¶ 14 (emphasis added).

148.   The Amended Complaint states a prayer for judgment "against each Defendant" that includes "actual damages or statutory damages pursuant to 17 U.S.C. § 504, at the election of [Achte]" and "[Achte's] reasonable attorney fees." Exhibit M, pp. 5-6.

149.   Those remedies are legally unfounded pursuant to Section 412, which bars Achte from obtaining Ineligible Remedies from any of the 3,644 members of Subclass II, including Plaintiff.

150.   In both the original complaint and the Amended Complaint, the identification of Ineligible Remedies as remedies available to Defendants from members of Subclass II is fraudulent.

151.   Even if Defendants' infringement claim were valid, Achte could not recover the Ineligible Remedies, as a matter of law, from any member of either proposed Subclass.

152.   Any settlement obtained by Defendants from members of either proposed Subclass on the basis of threats of liability for Ineligible Remedies is fraudulent.

153.   Upon information and belief, Defendants have never had a genuine intention of filing suit in any case where the relief available would be limited to actual damages.

154.   Upon information and belief, Defendants did not intend to name members of Subclass II as defendants in full-blown litigation at the time the Amended Complaint was filed.

155.   DGW employed the court's third-party discovery procedures without regard to Section 412.  From certain ISPs, DGW obtained discovery even though it made no allegation that any customer used those ISPs to infringe rights that would justify more than actual damages.

156.   For example, on information and belief, DGW sent a subpoena to SBC Internet Services upon receiving leave of court.  Appendix A to DGW's Amended Complaint shows that all 386 acts of infringement that Defendants alleged in connection with SBC Internet Services transpired between September 25 and December 28, 2009—all before the January 19, 2010 Effective Date.

**F.     Defendants Have Used Complaints and Subpoenas Supported by False Claims to Make More False Threats Directly to Class Members.**

157.   The false claims in Achte's copyright registration and court filings share one purpose: to enable DGW/USCG to obtain the contact information of alleged infringers.  Using that information, Defendants have been able to make further fraudulent claims and extortionate threats directly to the Class members, through their Letters and their settlement websites.

158.   Upon information and belief, Defendants had no genuine intention of litigating the claims made in the Letters at the time they were sent to members of Subclass II.  The Letters, which threaten litigation against each person addressed, fraudulently conceal Defendants' true intent.

159.   On or about May 19, 2010, Defendant Kurtz sent a Letter to Plaintiff, accusing him of infringing Achte's film *Far Cry* at 3:26:18 AM on December 11, 2009**.**  A true and correct copy of the Letter is attached as Exhibit N.

160.   Upon information and belief, DGW sends virtually the same demand letter to the defendants in each of its lawsuits on behalf of its film clients, and the Letter Kurtz sent to Plaintiff is but one instance of a form demand letter sent to thousands of John Doe defendants, substantially identical in all but certain factual allegations specific to each defendant, including: the subscriber's name, address, ISP, and IP address; the name of the motion picture allegedly infringed; the date and time of the alleged infringement; the peer-to-peer software that DGW alleges the subscriber used; a file hash factor allegedly associated with the subscriber; and the date by which DGW demands payment.[55]

161.   Therefore, upon information and belief, beyond those specific factual allegations, substantially all statements made in the Letter addressed to Plaintiff have been repeated in each Letter DGW has sent to members of the Class.

---

[55] Compare the virtually identical Letter from DGW sent to Jon Harrison, Sr. of Irving, Texas dated May 21, 2010, as published by CNET News at http://news.cnet.com/ 2300-1023_3-10003610-6.html, http://news.cnet.com/2300-1023_3-10003610-7.html, and http:// news.cnet.com/2300-1023_3-10003610-8.html (last visited November 1, 2010).   A true and correct copy of that published Letter is attached as Exhibit O.

162.   The Letter was sent to Plaintiff via first class mail by DGW. It was signed by Kurtz on behalf of DGW. It was printed on DGW letterhead.  See Exhibit N.

163.   The Letter informed Plaintiff that DGW had already filed suit in the United States District Court for the District of Columbia on behalf of its client Achte against John Doe Defendants, and that the ISP had supplied DGW with Plaintiff's contact information, identifying him "as one of the Defendants who has illegally obtained or shared our client's copyrighted motion picture through a peer-to-peer network *[Gnutilla, BitTorrent etc.]*." Id.

164.   Specifically, the Letter informed Plaintiff that, "[a]ccording to our records, you have placed a media file which contains the copyright-protected film content for our client's motion picture entitled ***Far Cry*** in a shared folder enabling others to download copies of this content." Id. It further claimed, "[w]e have also obtained the file name of the movie, the file size and the GUID, all corresponding to an IP address that was assigned to your ISP account at the time the infringing activity occurred." Id.

165.   DGW frames its Letters as mere settlement offers. For example, the Letter sent to Plaintiff bore several claims that it was "for settlement purposes only" and inadmissible as evidence. The Letter closed by stating, "we look forward to resolving our client's claim against you in an amicable fashion, through settlement." Id.

166.   The Letters offer not just a means of prompt resolution of the claim, but threats of severe consequences if the recipient fails to cooperate: "[w]e are sending you this letter as a courtesy before we are required to take more formal legal action which would involve adding you as a named Defendant to the lawsuit." Id.

167.    The Letter Kurtz sent to Plaintiff, dated May 19, 2010, offered a release of all legal

claims for $1,500, but allowed Plaintiff only until June 11 (23 days later) to comply, at

which point the price of settlement would increase to $2,500:

> In exchange for a <u>comprehensive release</u> of all legal claims which will enable you
> to avoid becoming a named defendant, our firm is authorized to accept the sum of
> **$1,500** as full settlement for its claims. **This offer will expire at 5pm EST on
> June 11, 2010.** Thereafter, our client will accept no less than the sum of **$2,500** to
> settle this matter, but this increased settlement offer will expire on June 30, 2010.

Exhibit N (emphasis in original).

168.    The Letter warned that if Plaintiff did not "settle by June 30th, we may add you to the list

of defendants to be served with a lawsuit. … So essentially, you can avoid being named a

Defendant in the lawsuit if you act before June 30th." <u>Id.</u>

169.    Upon information and belief, each Letter afforded its recipients only a similarly short

window of time to assess the factual and legal merits of the claims and threats.

170.    Upon information and belief, each Letter specifically and repeatedly links its demand for

payment to threats for Ineligible Remedies:

> [I]f you do not comply with the above requests we may be forced to name you as
> a Defendant to the lawsuit and proceed directly against you on behalf of our
> client. If forced to do so, our client will be seeking to recover the maximum
> amount of fees provided under the Copyright Act for copyright infringement,
> which is up to $30,000 per illegally downloaded film, plus attorneys' fees and
> costs of litigation.

<u>Id.</u>

171.    Upon information and belief, each Letter claims that the alleged infringement "requires

*deliberate* action," and claims that this subjects the accused to enhanced statutory

damages penalties:  "In the event we are able to prove the infringement was intentional,

our client will be seeking the maximum statutory damages allowed by the Copyright Act in the amount of $150,000 per infringement, attorneys' fees and costs." Id.

172. Defendants go to great lengths to raise the specter of large statutory awards and attorney's fees. To justify their demands, the Letter makes extensive reference to one recent copyright infringement case in which statutory damages were awarded:

> We feel that in light of the verdicts awarded in recent cases, our client's $1,500 settlement offer is extremely reasonable. For example, in the case of Sony BMG Music Entertainment v. Tenenbaum (D. Mass.) [1:07-cv-11446], a $675,000 jury verdict against a Boston University graduate student for illegally downloading and sharing 30 songs was recently upheld. This means that the jury awarded $22,500 per illegally-shared song. We think that by providing our Doe Defendants an opportunity to **settle our client's claim for $1,500 instead of having to incur thousands of dollars in attorneys' fees and being at risk for a high jury verdict**, out client is acting reasonably and in good faith.

> Id. (emphasis added).

173. The Tenenbaum damages award was subsequently held to violate the Due Process Clause, and the award was reduced by 90 percent, to $67,500, or $2,250 per song infringed (three times the statutory minimum of $750). Sony BMG Music Entertainment v. Tenenbaum (D. Mass.), Civ. A. No. 1:03-cv-11661-NG (filed July 9, 2010).

174. Having warned Plaintiff, and other recipients of the Letter, that the Tenenbaum damages award "was recently upheld," Kurtz has failed to clarify that his prime example of a typical recent verdict has since been found unconstitutionally excessive and decimated.

175. Defendants have thereby fostered the false impression that the original Tenebaum award was legitimate and relevant to the Letter's recipients.

176. Because the Tenenbaum award was for statutory damages, it has never been relevant to the allegations and threats Defendants have made to the members of Subclass II.

177.    The Letters' identification of statutory damages and attorney's fees as remedies available to Defendants from members of Subclass II is fraudulent.

178.    No member of Subclass II is "at risk of a high jury verdict" like the one initially awarded against Tenenbaum, because the Ineligible Remedies are categorically off limits.

179.    The Letters' frequent misleading references to statutory damages, including their multiple citations to the statutory maximums and uncorrected references to unconstitutionally excessive jury awards, were irrelevant to any claims Defendants could have brought in the Achte action. However, they were directly relevant to Defendants' implicit purpose: frightening and intimidating Letter recipients into hasty settlements under false pretenses.

180.    Each Letter misdirects its recipients in citing the relevant law. The Copyright Act is found at Title 17 of the United States Code, Sections 101 through 1332, inclusive. However, the Letter mentions the Act only once, and then only mentions a few Sections, as follows:

> The law provides protection for copyright owners through the Federal copyright statute found at 17 U.S.C. §§ 501-506, which allows the copyright owner to impound your material, recover their attorney's fees, and seek damages of $750 - $150,000 per work, depending on the circumstances of the infringement.

Exhibit N.

181.    That limited statutory citation was intentionally misleading as used in the Letter, because it omits any reference to the extensive limitations stated in the Copyright Act, including the limitations on Ineligible Remedies set out in Section 412. The Copyright Act states that statutory damages, and "a reasonable attorney's fee to the prevailing party," respectively, are available "[e]xcept as otherwise provided by this title," i.e., by the

Copyright Act.[56] The Letter misleadingly omitted reference to the limitations "otherwise

provided" in Section 412.

182.    Moreover, the Letter's bare statement that the Act "allows the copyright owner to

impound your material" threatens the accused with an unwarranted invasion of privacy,

making no reference to the Fourth Amendment's limitations on such seizures.  Exhibit N.

183.    Any harm Defendants might claim to justify this threat of impoundment is undercut

elsewhere in the Letter. The Letter conditions "settlement" on its demand that "you must

remove the file from the shared folder or location where our client's film can be shared or

copied within three (3) days of paying a settlement."  Id.

184.    But in the meantime, the Letter emphatically demands that no files be removed until

settlement is finalized:

> ***Please consider this letter to constitute formal notice that until and unless we
> are able to settle our client's claim with you, we demand that you not delete any
> media files from your computer.***

Id. (boldface and italics in original). The Letter threatens that as part of litigation, "we

will most certainly have a computer forensic expert inspect your computer," and further

threatens that, upon evidence suggesting premature removal of media files, Achte "will

amend its complaint to add a spoliation of evidence claim against you. Be advised that if

we were to prevail on this additional claim, the court could award monetary sanctions,

evidentiary sanctions and reasonable attorneys' fees."  Id.

185.    The Letter claimed that Plaintiff had placed an infringing file "in a shared folder enabling

others to download copies."  Id. But by insisting that accused infringers retain any

---

[56] 17 U.S.C. §§ 504(a) & 505.

infringing files in such folders until released by Defendants, obligating the accused to leave the files available to others for up to three days, the Letter mandated that the alleged infringement would continue.  Thus, the Letter seeks to perpetuate and multiply any harms from the alleged ongoing infringement, obligating recipients to allow further infringing downloads.  By inducing the harm it claims to prevent, each Letter affords Defendants opportunities to later amend their complaints to target subsequent downloaders (who could then be sent similar Letters mandating further open access to infringing files, ad infinitum).

186.    DGW's settlement demand letters do not include the underlying complaints as enclosures. Rather, they direct the accused to one of several claim settlement websites that feature a USCG logo, including among others http://www.farcry-settlement.com (the "*Far Cry* website"), http://www.copyrightsettlement.info and http://www.savecinema.org (collectively, the "USCG websites"), where the complaint may be viewed, and where the accused may obtain a release from legal claims by entering their credit card information.

187.    The complaints on the USCG websites cannot be viewed without a password. Each website displays a phone number and hyperlinks to email DGW for login information. Each USCG website prominently notes, "All Major Credit Cards Accepted."

188.    The Letter directed Plaintiff and others in the Class to the *Far Cry* website, specifically its FAQ section:

> You should visit the Frequently Asked Questions web page we have posted at www.farcry-settlement.com, which will provide additional information and hopefully answer many of the questions you have.

True and correct copies of pages from the *Far Cry* website, as they appeared on August

27, 2010, are attached as Exhibit P.

189.    Though the John Doe defendants have not yet been named as defendants, the FAQ

section of the *Far Cry* website informs them that they have been sued:

> 2. I have received a letter in the mail about a lawsuit. Why did I get this letter?
>
> This letter is a demand letter. *A lawsuit has been filed against you* in the United
> States Federal District Court for the Federal District of Columbia for copyright
> infringement as a result of information about your infringing download of a
> motion picture. If you pay the settlement amount and accept the terms of the
> settlement agreement proposed on your case then you will be dismissed from the
> lawsuit and your information will remain anonymous. If you do not accept the
> settlement agreement you may subsequently be served with the lawsuit and
> expected to defend the claim of copyright infringement as alleged in the
> complaint.

Exhibit P (emphasis added).

190.    The FAQ section of the *Far Cry* website also informs the accused that a $1,500

settlement would "almost always" cost less than defending the claim.  As in the Letters,

DGW/USCG couches its coercive tactics on its settlement websites as financial and

procedural *benefits* to the accused:

> 5. Are there potential benefits to settling this claim?
>
> We are not your attorneys and we are not providing you legal advice. We strongly
> recommend that you seek advice from an attorney. There are several aspects of
> settling the copyright infringement claim against you that you might find
> beneficial. Settling the claim allows you to pay a relatively nominal, one-time
> lump sum payment to completely resolve the claim, without having to defend
> yourself in court. *The legal fees incurred in defending a copyright infringement
> claim will almost always exceed the settlement amount demanded by our client.*
> Second, your settlement, identity and contact information will remain private, in
> that we will not release your information to any third party unless legally required
> to do so. Third, by settling, you will avoid the potential for a jury verdict against
> you that could exceed the amount of the settlement (up to $150,000, for willful

infringement) and include an award of our client's attorneys' fees, which will certainly be several thousand dollars more. Finally, settling allows you to resolve the claim quickly and easily, over the Internet or by mail.

Id. (emphasis added).

191.    The FAQ section, like the Letter, misleadingly emphasizes Ineligible Remedies, as if they were pertinent to members of Subclass II directed to the *Far Cry* website:

4. What are the consequences or damages that can be awarded in a copyright infringement case?

Statutory damages are available to the owner of a registered work under Title 17, Section 504 of the United States Code in an amount of between $750 and $30,000 per infringed work, if the infringement was not willful. If the infringement was willful, as asserted in the Complaint filed in this case, damages may be as much as $150,000 per infringed work.

Id. (emphasis added). USCG's limited statement to Class members, that "the consequences or damages that can be awarded" are statutory damages, omitted any reference to actual damages.

192.    The FAQ section restated the Letter's threat that not accepting the demands could lead to "a jury verdict against you that could exceed the amount of the settlement (up to $150,000, for willful infringement) and include an award of our client's attorneys' fees, which will certainly be several thousand dollars more." Id.

193.    That threat is legally baseless and therefore fraudulent as to Plaintiff and each other member of Subclass II (who Defendants accuse of infringing Achte's *Far Cry* copyright prior to its registration date), and was not relevant or pertinent to any legitimate claim Defendants might have raised in the litigation over the copyright.

194.    The complaint DGW filed on behalf of Achte was also posted on the *Far Cry* website.

195.   Each member of Subclass II who viewed the complaint there was subjected to its fraudulent misrepresentations of liability for Ineligible Remedies, which served to reinforce the falsehoods raised in the Letter.

**G.   Defendants Attempted to Keep Alleged Infringers in a State of Legal Limbo Until They Settle.**

196.   Achte filed its original complaint on March 18, 2010, and its Amended Complaint on May 12, 2010. Ordinarily, a civil action must be dismissed if plaintiffs fail to serve a summons on the defendant within 120 days of the complaint.[57]  But Defendants repeatedly sought to extend the time for service, maneuvering to extend the pendency of the Achte action against thousands of defendants, including the thousands of defendants against whom its claims for Ineligible Remedies were barred, irrelevant, and fraudulent.[58]

197.   The Amended Complaint designated, but did not name, each Class member as a defendant. Defendants sent Class members Letters with directions on viewing the complaint online, but failed to properly serve either the original complaint or the Amended Complaint on the Class.

198.   More than six months after filing the original complaint in the Achte action, Achte asserted through counsel that the Class members (who had not been named to the court and not formally served) were "not yet named parties" and therefore had no standing to seek its dismissal.[59]  This sophistry directly contradicted claims Defendants made to the Class, including in its Letters ("Your contact information was provided to us by your ISP

---

[57] Fed. R. Civ. P. 4(m).

[58] See Minute Order, No. 10-453 (D.D.C. July 22, 2010) (extending time to name and serve defendants until November 18, 2010).

[59] Plaintiff's Opposition to Motions to Dismiss, pp. 8-9, No. 10-453 (D.D.C. Sept. 24, 2010).

as one of the Defendants ...") and the *Far Cry* website ("A lawsuit has been filed against you ..."). The Class members were parties to the Achte action, albeit ones named by their IP addresses.

199.    Defendant GuardaLey compiles the IP addresses of purported infringers of the copyright in DGW/USCG's client's films,[60] identifying the ISP of each accused infringer, the date and time of each alleged copyright infringement, and the film each one allegedly uploaded or downloaded.[61]

200.    The IP addresses include sufficient identifying information to allow Defendants to determine the home states of those they accuse, even without the aid of subpoenas.[62] Indeed, "the very information upon which [Achte relied] as a basis for seeking the identity of the Doe defendants – their Internet Protocol (IP) addresses – indicates that few, if any, reside in this District."[63]

201.    Defendants were aware that that almost no one accused of infringement in the Achte action is subject to jurisdiction in Washington, D.C..   The shortcomings of Achte's jurisdictional claims were readily ascertainable by simply reviewing the geo-coded IP addresses that GuardaLey compiled:

---

[60] Declaration of Patrick Achache in Support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference, ¶¶ 6-7, No. 10-453 (D.D.C. Mar. 18, 2010).

[61] Id. ¶¶ 10, 13.

[62] See Omnibus Motion & Memorandum to Quash Subpoena Pursuant to Fed. R. Civ. P. 45(C)(3) and Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(2) at pp. 8-12, No. 10-453 (D.D.C. Sep. 10, 2010) (describing the process of using ISP addresses to determine geographic locations).

[63] Memorandum of Amici Curiae in Support of Third Party Time Warner Cable's Motion to Quash or Modify Subpoena, p. 5, No. 10-453 (D.D.C. June 2, 2010).

> [W]ith minimal investigation, [Achte] could have discovered that hardly any of the Does it has sued appear to reside in this District ... and that therefore the case against them was likely not properly brought here. Nonetheless, [Achte] improperly sued them here, apparently seeking to force almost all of the Doe defendants to incur the expense and burden of defense in a foreign District (or to settle in order to avoid that expense)."[64]

202.   Defendants could have conducted such a review before filing the original complaint or the Amended Complaint were filed.   Even had they not done so, the truth about jurisdiction was unavoidable when Defendants addressed and mailed Letters to Class members at addresses across the country, with only a fraction of them in or near Washington, D.C.

203.   Defendants continued demanding and receiving payments from Class members to settle the case without need for a formal appearance in the District of Columbia.

204.   Put simply, Defendants were aware that filing the Achte action in the District of Columbia would pressure settlement from Class members for even unfounded claims, so they could avoid the expense of fighting litigation in a remote jurisdiction.

205.   On September 10, 2010, the court in the Achte action ordered Achte to show cause why Class members who had submitted affidavits regarding their remote locations should not be dismissed.[65]   On September 24, 2010, in an opposition to the alleged infringers' motion to dismiss, Achte argued (through DGW) that "it would not make practical sense to dismiss particular Doe Defendants on a piecemeal basis before" the court-ordered deadline to name and serve all defendants.[66]   On November 18, 2010, the last day of its

---

[64] Id. at 6.

[65] Order, No. 10-453 (D.D.C. Sept. 10, 2010).

[66] Plaintiff's Opposition to Defendants' Motion to Dismiss, No. 10-453, p. 8 (D.D.C. Sep. 24, 2010).

already-extended time to name and serve defendants, Achte did not do so; instead, it asked the court to extend time for service on the defendants for *five years*, arguing that it should not be forced to actually litigate its case against *any* Class member until *every* Class member had been identified.[67]

206. On November 19, 2010, the court in the Achte action ordered Achte to file a Second Amended Complaint "identifying by name and address Defendants over whom it reasonably believes the Court has personal jurisdiction and whom it wants to sue," or, if it did not have that information, the IP addresses of those over whom the plaintiffs continued to claim the Court had jurisdiction.[68]  The court also required Achte to submit a status report by February 18, 2011 as to any Class members for whom it did not yet have identifying information from the ISPs.  Noting that "many individuals have entered the case as 'Interested Parties' and have moved to dismiss all allegations against them, most protesting this Court's jurisdiction over persons in other parts of the country," the court ordered that Achte limit any amended complaint to Class members over whom Achte reasonably believed the court had personal jurisdiction.

207. In response to that Order, Achte filed a second amended complaint on December 6, 2010 (dated December 3, 2010).[69]  In it, Achte named just *one Class member* as a defendant in, along with 139 unnamed "John Doe" defendants, out of the 4,577 Class members whom Achte had identified by IP address in its Amended Complaint on May 12, 2010.  At the

---

[67] Motion for Order for Further Extension of Time to Name and Serve Defendants, No. 10-453 (D.D.C. Nov. 18, 2010).

[68] Order, No. 10-453, (D.D.C. Nov. 19, 2010) (granting in part and denying in part Achte's motion for extension of time to name and serve defendants in the Achte action).

[69] Second Amended Complaint, No. 10-453 (D.D.C. Dec. 6, 2010).

same time, Achte filed a notice of dismissal of its claims against all other members of the Class.

208.    The second amended complaint in the Achte action was filed shortly after November 24, 2010, when Plaintiff filed his initial complaint in this Court, which directly addressed the issue of Achte's pursuit of Ineligible Remedies in the Achte action.

209.    For the one named defendant and each of the other 139 unnamed defendants, Achte's second amended complaint alleged only dates of infringement after the Effective Date.

210.    On December 14, 2010, the court entered an order approving Achte's dismissal of its claims against all other members of the Class—over 4,400 dropped claims.[70]   The next day, the accused infringers' outstanding motions to dismiss for lack of jurisdiction were denied as moot in light of Achte's withdrawal.[71]

211.    Many of the remaining John Doe defendants in the Achte action exhibit the same obvious signs that Achte's claims of jurisdiction are inappropriate, namely, they have IP addresses that are not within the District of Columbia.[72]

212.    Since withdrawing their claims against the majority of Class members in the Achte action, Achte has not pursued its claims against the vast majority of Class members with lawsuits in other jurisdictions.   However, Achte has filed suit against a handful of Class members in other courts, alleging infringements after the Effective Date.

---

[70] Order, No. 10-453 (D.D.C. Dec. 14, 2010).

[71] Minute Order, No. 10-453 (D.D.C. Dec. 15, 2010).

[72] See Jared Moya, US Copyright Group Reduces P2P Lawsuits to Just 140, Dec. 7, 2010 (available at http://www.zeropaid.com/news/91477/us-copyright-group-reduces-p2p-lawsuits-to-just-140/) (last visited Feb. 8, 2010) (noting that "even the amended list includes a number of IP addresses well beyond [the court's] jurisdiction," and listing IP addresses of John Doe defendants from Honolulu, Hawaii; Chicago, Illinois; Columbus, Ohio; and Carson, California).

**H.    For any Infringement of its Copyright that Commenced Prior to Valid Registration, Achte's True Remedy Is Limited to Some Fraction of $26.99.**

213.    Defendants threatened to seek statutory damages of up to $150,000, and attorney's fees, from 3,644 individuals (Subclass II) whom they allege infringed Achte's copyright prior to January 19, 2010, and whose alleged infringements therefore commenced prior to that date.  Achte, through DGW and Dunlap, claimed a right to do so in court filings in the Achte action.  But DGW, USCG, and Dunlap knew that Achte could not claim that right.

214.    Because Achte cannot seek statutory damages for any of the copyright infringements it alleges by members of the Class, the most Achte can hope to recover for any such alleged pre-registration infringement would be actual damages.

215.    Upon information and belief, the actual damages available to Achte for the infringement alleged in the Complaint would be some fraction of the retail list price of a DVD, as a measure of Achte's lost profits.

216.    Upon information and belief, the list price of a new DVD of *Far Cry* is $26.99.

217.    USCG, DGW, and Achte have a direct financial incentive to avoid settling claims in the amount of any actual damages Achte may have incurred, which (at some fraction of $26.99) would be more than 50 times lower than the settlement offer it has presented to members of the Class.

218.    Upon information and belief, if the Letters had honestly informed members of Subclass II that no more than a fraction of $26.99 was at stake, none would have entertained a settlement offer anywhere near $1,500.

219.    $26.99 is a far cry from $1,500.

220.   Upon information and belief, if the Letters had honestly informed members of Subclass II that the statutory damages award amounts it references (up to $150,000) were irrelevant, none would have entertained a settlement offer anywhere near $1,500.

221.   $26.99 is a far cry from $150,000.

222.   The false elements of Defendants' claims predominate the Letters.   Kurtz repeatedly referred to exorbitant penalties to which Achte has no legal right; but Kurtz never mentioned actual damages, Achte's true remedy.

## CONCLUSION

223.   The DGW revenue model does not require that each individual claim is meritorious. Even when its allegations have no basis in the copyright law, or when particular accused individuals are wholly innocent, there is still money to be made by Defendants.

224.   DGW is well aware of the extremity of the damages awards it claims in its demand Letters, and that its "settlement offer" is less expensive than attorneys would charge merely to begin a litigation defense.

225.   Nonetheless, DGW capitalizes on fear and aims to intimidate, such that even non-infringers will be likely to pay up rather than risk higher fees and damages.

226.   Upon information and belief, Defendants have already collected millions of dollars in settlements from members of the Class, much of it on the basis of false claims that Defendants knew, or should have known, to be false.

227.   Plaintiff has not acceded to Defendants' demands and has not paid to settle the claims. However, he has incurred costs in retaining counsel. The costs of counsel that Plaintiff has borne, in reliance on the false allegations of the Letter, are directly attributable to

Defendants' fraudulent activity. Plaintiff would have avoided those costs had the Letter been truthful.

228.   Upon information and belief, members of the Class have paid Defendants millions of dollars in extortion money, spent untold further sums on legal counsel, and borne other incidental costs in reliance on Defendants' fraudulent statements.

229.   Upon information and belief, members of the Class would have avoided those expenses if not for Defendants' fraudulent statements.

230.   Upon information and belief, members of the Class who accepted Achte's demands agreed not to disclose the terms of settlement, and further agreed that breaching the settlement agreement's confidentiality would subject the Class member to $15,000 in automatic liquidated damages, attorney's fees, and costs.

231.   Defendants have colluded to implement the USCG copyright settlement business model indiscriminately, extorting thousands of alleged infringers without due regard for the legal foundation of their threats.

232.   Defendants have sought to paper over the missing foundation for their threats to the Class by perpetrating fraud on the U.S. Copyright Office, obtaining a certificate of registration under false pretenses that lists false information, without which their threats would have rung hollow.

233.   Fraud has infected each stage of Defendants' actions since that false registration, tainting their complaints, subpoenas, coercive demand Letters and websites—all the tools of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

234.   Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.   Plaintiff seeks to certify the following class and subclasses:

(a)   a class of all 4,577 persons (the "Class") who Defendants allege infringed the Achte copyright prior to May 12, 2010, the date on which Defendants filed their Amended Complaint;

(b)   a subclass of all 917 persons ("Subclass I") who Defendants allege infringed the Achte copyright prior to its claimed date of publication, November 24, 2009; and

(c)   a subclass of all 3,644 persons ("Subclass II") who Defendants allege infringed the Achte copyright prior to its effective date of registration, January 19, 2010.

235.   The putative Class is so numerous as to make it impracticable to join all members of the class as plaintiffs.

236.   The class period is limited to the applicable statute of limitations for the claims at issue.

237.   There are questions of law and fact that are common to all members of the purported class, which questions predominate over any questions affecting only individual class members.

238.   The principal common issues include the following:

(a)   whether Defendants wrongfully asserted rights to statutory damages and attorney's fees for acts of alleged copyright infringement;

(b)   whether the copyright registration certificate is valid;

(c)     whether Dunlap committed fraud on the Copyright Office that invalidates the copyright registration Achte has used to support its claims;

(d)     whether Achte, through its agents USCG, DGW, Dunlap and Kurtz, wrongfully threatened Class members on the basis of fraudulent and/or negligent omissions and/or misrepresentations;

(e)     whether acts by some or all Defendants constitute fraud, extortion, abuse of process, copyright misuse, and/or misappropriation of funds from the Class members;

(f)     whether settlements obtained by Defendants from members of the Class were obtained, and whether payments by Class members to retain counsel were made, on the basis of Defendants' fraudulent and/or negligent omissions and/or misrepresentations;

(g)     whether acts by some or all Defendants constitutes a conspiracy; and

(h)     the form and amount of damages and costs, if any, that Achte could legitimately seek in a copyright infringement action against any proposed Class members.

239.    In this case there is no question as to the identification of class members because the Class is limited to the 4,577 John Doe defendants whom Defendants contend infringed Achte's copyright, and Defendants have a database identifying each Class member whose contact information they have obtained and employed.  There is also no issue as to the amount of the Class members' damages because the amount of each wrongful settlement is contained within Defendants' records, and the Class members can demonstrate the

amount of any additional damages suffered individually, including attorney's fees and other legal costs associated with resolving exaggerated claims.

240.   The claims of Plaintiff are typical of the claims of all the members of the Class because all claims are based on the same legal and remedial theories.

241.   Plaintiff will fairly and adequately protect the interests of all Class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.   Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class that he seeks to represent.   Plaintiff believes that he has been wronged, wishes to obtain redress of the wrong and wants Defendants stopped from reaping ill gotten gains.   To that end, Plaintiff has retained counsel knowledgeable in copyright law and experienced in trial work in general.   Neither Plaintiff, nor counsel, have any interest that may cause them to not vigorously pursue this action.

242.   Plaintiff brings this action under Rule 23(b)(3) because common questions of law and fact (identified in paragraph 237 above) predominate over questions of law and fact affecting individual members of the Class.   Indeed, the predominant issues in this action are whether Defendants are violating and have violated the law by pressing illegitimate claims in the United States Copyright Office, the United States District Court for the District of Columbia, and in coercive communications with Class members nationwide. In addition, the expense of litigating each Class member's claim individually would be so cost-prohibitive as to deny Class members a viable remedy.

243.   Certification under Rule 23(b)(3) is appropriate because:

(a)   the individual class members may not be aware that they have been deceived and are thus unable to prosecute individual actions;

(b)   the amount of money Defendants have wrongfully collected from each Class member who assented to settlement, sums likely no greater than $2,500, does not justify individual lawsuits;

(c)   Defendants have sought discovery from third-party ISPs regarding all Class members on the basis of the Achte complaint and supporting documents filed in the United States District Court for the District of Columbia and have threatened to further litigate its claims against Class members, but have not yet named any Class member as a defendant individually, in that Court or any other;

(d)   concentration of the litigation concerning this matter in this Court is desirable;

(e)   the claims of the representative Plaintiff are typical of the claims of the members of the purported class;

(f)   a failure of justice will result from the absence of a class action; and

(g)   the difficulties likely to be encountered in the management of this class action are limited.

244.   Plaintiff also brings this action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making final injunctive relief concerning the Class as a whole appropriate. In the absence of appropriate injunctive and/or declaratory relief, Defendants will continue to gather contact information for alleged infringers, threaten them with illegitimate claims, and collect settlements stemming from the same activity.   Defendants' uniform conduct

towards Plaintiff and the other members of the Class makes certification under Rule 23(b)

(2) appropriate, including but not limited to:

(a)     GuardaLey has uniformly accessed Class members' IP addresses and other data;

(b)     Achte, through its agents DGW, Dunlap, and Kurtz, has uniformly employed data

compiled by GuardaLey to justify claims for statutory damages and attorney fees,

in courtroom filings and in uniform letters Kurtz addressed to the Class members

individually;

(c)     Dunlap falsified information on the copyright registration that obscured the

fraudulent aspects of Achte's claim against each Class member;

(d)     Kurtz sent fraudulent Letters to members of the Class, threatening Ineligible

Remedies to secure wrongful settlements.

(e)     DGW and Dunlap developed USCG, an alias for DGW, which facilitated, aided,

abetted, and/or conspired with DGW and Achte's pursuit of fraudulent settlements

from each Class member.

245.   Defendants' wrongful acts are unlikely to be remedied absent a class action. Many Class

members who paid to settle Achte's claims may not yet be aware of the extent of

Defendants' wrongdoing.   Moreover, members of the Class who accepted DGW's

demands agreed not to disclose the terms of settlement, and further agreed that breaching

the settlement agreement's confidentiality would subject the member of the Class to

$15,000 in automatic liquidated damages, attorney's fees, and costs.

246.   In contrast, on a class-wide basis, Defendants have reaped huge monetary gains by

uniformly and systematically collecting settlements on the basis of fraud and extortion.

## CLAIMS

FIRST COUNT FOR RELIEF
**Fraudulent Misrepresentations**

247.    Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference

all allegations contained in this Complaint.

248.    The Defendants made numerous false representations, both orally and in writing, to the

Class members, including:

(a)    threatening to name members of the Class as defendants in the Achte action

without seriously intending in good faith to do so;

(a)    threatening to name members of the Class as defendants in other lawsuits without

seriously intending in good faith to do so;

(b)    threatening to pursue claims against members of Subclass I for Ineligible

Remedies, despite the absolute bar of Section 412(1);

(c)    threatening to pursue claims against members of Subclass II for Ineligible

Remedies, despite the absolute bar of Section 412(2);

(d)    claiming that the copyright registration for *Far Cry* is valid despite material

misrepresentations made by Defendants in the application; and

(e)    threatening to file suit against members of the Class to pursue claims for

Ineligible Remedies on the basis of a certificate of registration that does not

satisfy Section 411(b).

249.    At the time Defendants made these representations, the Class members did not know that

they were false and fraudulent.

250.   These false representations were material to decisions by Class members to settle Achte's claims and/or expend money on counsel. Had the Class members known that these representations were not true, they would not have agreed to Defendants' terms for settlement, nor paid counsel for legal advice and assistance regarding those claims.

251.   The Defendants made the false representations knowing them to be false or being aware that the Class members did not know whether the representations were true or false.

252.   The Defendants willfully and consciously disregarded the truth of these false representations.

253.   The Defendants made the false representations with the intent that the Class members would rely on the false representations. In order to ensure that reliance, the Defendants kept plaintiffs ignorant of the material misrepresentations in Achte's copyright registration and in their communications with the Class members.

254.   The Class members relied on the Defendants' false representations by paying to settle or retain counsel, when they would not have done so had they known the truth about Achte's copyright registration.

255.   The Class members' reliance was reasonable and justified, and they had a right to rely on the Defendants' false representations.

256.   As a direct and proximate result of the Defendants' false representations, and the Class members' reliance on those false representations, the Class members suffered injuries, damages, or losses in an amount to be determined at trial.

257.   The Class members are entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

SECOND COUNT FOR RELIEF
**Fraudulent Omissions/Nondisclosure**

258.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

259.   The Defendants failed to disclose to and concealed from the Class members, and engaged in a scheme to keep the Class members ignorant of, pertinent and material information regarding the falsity of certain claims made by Defendants, Defendants' knowledge of that falsity, and Defendants' intent to not pursue the vast majority of unsettled claims. Specifically, the Defendants failed to disclose and concealed from Class members pertinent and material information that includes but is not limited to the following:

(a)   Dunlap, as part of DGW and USCG, on behalf of Achte, when he filed the application to register the copyright for the motion picture *Far Cry*, concealed, omitted and failed to disclose material information concerning its date of first publication.

(b)   Dunlap, Kurtz, and DGW, on behalf of Achte, when they filed suit against the Class and served discovery requests on the Class members' ISPs, concealed, omitted and failed to disclose the falsity of the registration and the bar against statutory damages and attorney's fees (the Ineligible Remedies) for works published more than three months prior their copyright registration;

(c)     Defendants then threatened members of the Class, including Subclass I and Subclass II, with claims for Ineligible Remedies, concealing, omitting and failing to disclose that any infringement claim by Achte would, in fact, limited to actual damages; and

(d)     Defendants concealed, omitted and failed to disclose that they never intended to file suit against the vast majority of Class members individually, whether they settled or not.

260.    The Defendants had superior knowledge and information about that pertinent and material information, which knowledge and information was not reasonably available to the Class members and could not have been discovered through ordinary diligence. Having made materially false representations to the Class members, Defendants had a duty to speak and to inform the Class members of the truth about the non-disclosed, omitted, and concealed facts.

261.    By failing to disclose to, omitting, and concealing from the Class members the true facts regarding the scope of Achte's copyright, the falsity in its registration, and its lack of intent to fully litigate its claims, the Defendants intended to create a false impression of the actual facts in the minds of the Class members.

262.    The Defendants sought to ensure that members of the Class would not discover the truth by:

(a)     filing a materially misleading application to register the copyright for *Far Cry*, and using that registration as a license to claim Ineligible Remedies from members of Subclass II;

(b)   intimating, in the FAQ section of the *Far Cry* settlement website, that the fees for representation by counsel to defend the claim "will almost always exceed the settlement amount"; and

(c)   filing a single complaint in the District of Columbia against thousands of John Doe defendants nationwide, though Defendants knew that would be a remote location for almost every Class member.

263.   The Defendants' nondisclosures, omissions, and concealments were material because, had the members of the Class known the truth, they would not have agreed to Defendants' terms for settlement and would not have entrusted funds to the Defendants, and/or would not have paid to retain counsel, among other expenditures.

264.   The Defendants knew that: (1) this information would have been highly material to the members of the Class decision of whether to settle and/or retain counsel; (2) the members of the Class were ignorant of this material information; and (3) the members of the Class were not in a position to discover the truth about DGW and USCG's operations.

265.   The members of the Class relied on the Defendants' fraudulent nondisclosures, omissions, and concealments when the Class members made settlement payments and other expenditures that they would have avoided had they been aware of the truth.

266.   The Class members' reliance was reasonable and justified under the circumstances, and they had a right to rely on the facts as they believed them to be absent knowledge of the fraudulent nondisclosures, omissions, and concealments.

267.   As a direct and proximate result of the Defendants' fraudulent nondisclosures, omissions, and concealments, and the Class members' reliance on the assumption that the concealed

and undisclosed facts did not exist or were different from what the facts actually were, the Class members suffered injuries, damages, or losses in an amount to be determined at trial.

268.   The Class members are entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

THIRD COUNT FOR RELIEF<br>**Conspiracy to Commit Fraud**

269.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

270.   The Defendants each knowingly and willfully conspired and agreed to engage in the scheme to defraud described in this Complaint.

271.   The Defendants committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

272.   As a direct and proximate result of the Defendants' conspiracy to commit fraud, members of the Class suffered injuries, damages, or losses in an amount to be determined at trial.

273.   Members of the Class are entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

FOURTH COUNT FOR RELIEF<br>**Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.***

274.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

275.   All computers used by Defendants without authorization or in excess of authorized access, were at all relevant times used in interstate commerce and are protected computers pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e).

276.   Defendants intentionally accessed the secure, protected computers of members of the Class, or other protected computers, without authorization or exceeding their authorization, and thereby obtained information from those protected computers, in violation of 18 U.S.C. § 1030(a)(2)(C).

277.   Defendants knowingly and with the intent to defraud, accessed the secure, protected computers of members of the  Class, or other protected computers, or caused others to access the secure, protected computers of members of the Class, or other protected computers, without authorization or in excess of their authorized access, and in furtherance of the intended fraud obtained confidential information and/or other valuable information which has a value exceeding $5,000 in a one-year period, in violation of 18 U.S.C. § 1030(a)(4).

278.   Defendants knowingly caused the transmission of a program, information, code, or command and/or intentionally accessed the protected computers of members of the Class and/or other protected computers, and, as a result, intentionally and without authorization, recklessly caused damage and loss to the secure, protected computers of Class members and/or other protected computers in violation of 18 U.S.C. §§ 1030(a)(5) (A)-(C).

279.   Defendants, through their actions in violation of 18 U.S.C. §§ 1030(a)(2), (a)(4), and (a)(5)(A)-(C), have caused Class members to incur losses for responding to and investigating Defendants' misconduct, including damage and security assessments, exceeding $5,000 during a one-year period in violation of 18 U.S.C. §§ 1030(g) and (c)(4)(A)(i)(I). The investigation of such losses continues.

280.   In addition to an award of compensatory damages, members of the Class are also entitled to injunctive relief pursuant to 18 U.S.C. § 1030(g), restraining and enjoining Defendants and all those in privity, concert or participation with Defendants from engaging in such wrongful acts in violation of 18 U.S.C. §§ 1030(a)(2), (a)(4), and (a)(5)(A)-(C).

## FIFTH COUNT FOR RELIEF
**Aiding and Abetting Fraud**

281.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

282.   Each of the Defendants knew about the schemes used to defraud the Class members that are described in this Complaint.

283.   Each Defendant actively participated in the schemes to defraud by knowingly providing encouragement and substantial assistance in perpetration of the fraud, as described in this Complaint.

284.   As a direct and proximate result of the Defendants' encouragement and substantial assistance in perpetration of the fraud, members of the Class suffered injuries, damages, or losses in an amount to be determined at trial.

285. Class members are entitled to punitive damages because the Defendants conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

SIXTH COUNT FOR RELIEF
**Violations of RICO, 18 U.S.C. § 1962(c)**

286. Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

287. This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of Plaintiff and the Class.

288. Plaintiff, the members of Class, and the Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

289. At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

**The Enterprise**

290. For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) Thomas Dunlap, (b) Nicholas Kurtz, (c) Achte, (d) USCG, (e) GuardaLey, and (f) DGW, including their directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "Enterprise." The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating settlement demands to alleged infringers, which all too often includes disseminating fraudulent misrepresentations and using extortionate

tactics; (b) implementing the Copyright Scheme; (c) deriving profits from the activities of the Enterprise; and (d) perpetuating use of a fraudulently obtained copyright registration to threaten statutory damages and attorney's fees against alleged infringers. Defendants each has a common purpose of perpetuating the use of the fraudulently obtained *Far Cry* copyright registration to coerce "settlements" from alleged infringers in lieu of statutory damages or attorney's fees.

291.   The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendants. There is a common communication network by which the Defendants share and continue to share information on a regular basis. Typically this communication occurs by use of the wires and mails in which Defendants discuss and agree on the continuation and management of the Copyright Scheme. In addition, Defendants used the wires and mails to implement their Copyright Scheme directly against alleged infringers. Defendants functioned as a continuing unit for the purposes of implementing the Copyright Scheme and to continue its existence.

292.   At all relevant times, Defendants were aware of each other's conduct, were knowing and willing participants in that conduct, and reaped profits from that conduct. Defendants were aware that the *Far Cry* copyright registration was obtained fraudulently to aid in coercing inflated "settlements" from alleged infringers as part of the Copyright Scheme. This awareness comes from the following sources:

(a)   Achte, as producers of the film, knew at all relevant times the nation and date of first publication of *Far Cry*;

(b)     Achte has filed countless other films in accordance with U.S. copyright law;

(c)     DGW, Dunlap and Kurtz all hold themselves out as copyright experts;

(d)     Dunlap, who filled out the Far Cry registration, has published knowledge of Section 412 and its impact on foreign rights holders;

(e)     USCG is an alias of DGW, so it is only logical it too had knowledge. As a partner in USCG, GuardaLey's knowledge can be imputed.

293.   The foregoing evidences that each Defendant was a willing participant in the Enterprise; that each had a common purpose and interest in the establishment and operations of the Copyright Scheme; and their agreement to a structure as to how the operation of the Enterprise would be conducted, *i.e.*, through USCG's management  and operation of the Enterprise and Defendant DGW's status as copyright attorneys.   This structure was the basis on which the enterprise operated.

**The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**
**18 U.S.C. § 1341 and 18 U.S.C. § 1343**

294.   The Enterprise engaged in and affected interstate commerce because it conspired to and engaged in the following activities across state boundaries, including: The transmission and publication of false and misleading information concerning the District of Columbia Court's jurisdiction over the Class, fraudulently obtained subpoenas on ISPs and applicability of the Ineligible Remedies to the Class.

295.   The Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by the U.S. mails and interstate wire facilities.

296.  The nature and pervasiveness of the Copyright Scheme, which was orchestrated out of the corporate headquarters of each Defendant, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

297.  Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have not been disclosed and cannot be alleged without access to these Defendants' books and records. Indeed, an essential part of the successful operation of the Copyright Scheme alleged herein depended upon secrecy. However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Copyright Scheme; Plaintiff describes this below.

298.  The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the Copyright Scheme involved potentially thousands of communications including, *inter alia*:

    (a)  Marketing materials about USCG's services, which DGW, sent to prospective clients located across the country;

    (b)  Written representations and telephone calls between Defendants regarding the Copyright Scheme;

    (c)  Written representations and telephone calls between Defendants and members of the Class and/or their counsel regarding the Copyright Scheme;

    (d)  E-mails between Defendants agreeing to or effectuating the implementation of the Copyright Scheme;

(e)     Written and oral communications directed to U.S. Government agencies and courts that fraudulently misrepresented what the Ineligible Remedies were, or that were intended to deter investigations into the true nature of the Copyright Scheme; and

(f)     Receipts of increased profits sent through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Scheme.

299.    In addition to the above-referenced RICO predicate acts, it was foreseeable to each Defendant that DGW would distribute the Letters containing false and extortionate representations through the U.S. mails and by interstate wire facilities. Further, each Defendant has, in furtherance of the Copyright Scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions. These uses of the U.S. mails include some of the documents referenced in this Complaint.

## The Defendants' Use of Extortionate Tactics
## 18 U.S.C. § 1951

300.    In furtherance of the Copyright Scheme, Defendants, their agents and/or others acting at Defendants' direction and on their behalf, with the threat of Ineligible Remedies and fraudulent and financially burdensome threats of litigation, have conspired to and have in fact extorted or attempted to extort "settlement payments" from members of the Class and/or have caused them to otherwise foreseeably part with property in violation of 18 U.S.C. § 1951.

301.    Defendants verbally and by written communication have demanded and/or received money from the Class members. Typical money demands from the Defendants contained

in the Letters range from $1,500 to $2,500.   In addition, it was foreseeable to the Defendants' that Class members would suffer additional economic harm as a direct result of their Copyright Scheme, this includes the costs and expenses related to retaining counsel.

302.   Members of the Class consented to enter into "settlement agreements" and/or other foreseeable economic harm under the wrongful threat of, but not limited to:

    (a)    Fraudulent claims for Ineligible Remedies;

    (b)    Financially burdensome legal expenses, the result of improper jurisdiction and to defend against claims that Defendants never intended to file;

    (c)    Defendants' statement that it would always cost to settle than to seek counsel;

    (d)    Repeated statements to the press by Defendants' that they would pursue Class members who didn't settle (instead, Achte voluntarily dismissed its claims against over 4,400 Class members under Court order to amend its complaint to include only those Achte reasonably believed to be within the court's jurisdiction) ; and

    (e)    Defendants' use of the <u>Tenenbaum</u> case to raise the specter of large statutory awards and attorney's fees without mentioning that the award in that case was found unconstitutionally excessive and reduced by 90 percent.

303.   The Defendants, under the guise of attorneys, made the threats with the intent that members of the Class, as lay persons, would rely on them.

304.   Members of the Class did rely on Defendants' wrongful threats, which were material to their decisions to settle and/or retain counsel. Had they known that Defendants' threats

were without substance, the Class members would not have settled and/or suffered other foreseeable economic harm.

305.    There is no dispute in these cases that Defendants interfered with, disrupted, and in some instances completely deprived Class members of their ability to exercise their property rights. The Defendants' activities caused economic harm to the Class, which affords the Class members standing under Section 1964(c).

**Conduct of the RICO Enterprises' Affairs**

306.    The Defendants have exerted control over the Enterprise and, in violation of RICO Section 1962(c), the Defendants have conducted or participated in the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)      Each of the Defendants had a degree of control concerning the Copyright Scheme;

(b)      At all times relevant, Achte knew the date of first publication for its film, *Far Cry*, and had previously registered its other films in accordance with U.S. copyright law;

(c)      USCG has directly controlled the creation and distribution of marketing, sales, and other materials used to inform prospective clients as to its services;

(d)      DGW and Dunlap intended to and did file a false copyright registration in furtherance of the Copyright Scheme;

(e)      USCG/DGW, Dunlap and Kurtz intended to and did distribute their Letters containing false claims of Ineligible Remedies and jurisdiction through the U.S. mails and by interstate wire facilities; and

(f)     Defendants have allowed USCG/DGW to exert control over the Enterprise knowing that the *Far Cry* copyright registration was fraudulent, that they had no jurisdiction over the Class members, and/or that there was a problem regarding the dates of alleged infringement. USCG/DGW controlled the Enterprise because forcing settlements is its business, and was integral to increasing Defendants' profits for the reasons set forth herein.

307.   The Enterprise appears to have a hierarchical decision-making structure headed by USCG regarding the Copyright Scheme and each other Defendant accepted those instructions despite knowing of their falsity.

308.   In violation of Section 1962(c) of RICO, each Defendant conducted the affairs of the Enterprise with which it associated by establishing the Copyright Scheme which was then published and disseminated nationwide to members of the Class.

**The Defendants' Pattern of Racketeering Activity**

309.   Each of the Defendants conducted and participated in the affairs of the above referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1951, relating to extortion, 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The Defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities and extortionate acts in furtherance of their Scheme. Each of these fraudulent mailings and interstate wire transmissions and extortionate acts constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C.

§ 1961(5), in which the Defendants intended to defraud and extort Plaintiff, members of the Class and other intended victims.

310.   Defendants calculated and intentionally crafted the Copyright Scheme to ensure that Plaintiff and members of the Class would settle no matter innocence and would do so in excess of any actual damages Defendants' suffered. In designing and implementing the Copyright Scheme, at all times the Defendants were cognizant of the fact that recipients of the Letters and the courts, would rely on the integrity of the copyright registration and any representations made by Defendants' when purportedly speaking as attorneys.

311.   By intentionally and fraudulently obtaining the copyright registration and therefore the services of the court, and by subsequently failing to disclose such practices to the individual Class members, the Copyright Office, or the Court for the District of Columbia, the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

312.   The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive the Plaintiff and members of the Class. Each separate use of the U.S. mails and/or interstate wire facilities and each extortionate act employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff and members of the Class. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

**Damages Caused by the Defendants' Copyright Scheme**

313.    The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business or property because Plaintiff and members of the Class have been coerced into paying many millions of dollars in inflated "settlements" and/or have incurred related expenses defending themselves against the Copyright Scheme as described herein.

314.    The Defendants sent the Letters and other communications essential to the Copyright Scheme through the U.S. mails or by interstate wire facilities and reported information by the same methods in furtherance of their Copyright Scheme. Plaintiff and members of the Class have made inflated "settlement payments" in reliance on the false and extortionate statements contained in the registration, Letters and other communications and/or have otherwise been deprived of their property as a direct and proximate result of the Copyright Scheme.

315.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

SEVENTH COUNT FOR RELIEF
**Conspiracy to Violate RICO under 18 U.S.C. § 1962(d)**

316.    Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

317.    Each of the Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct, and participate, directly or indirectly, in the conduct of, the affairs of the Copyright

Scheme through a pattern of racketeering activity. This agreement was in violation of 18 U.S.C. § 1962(d).

318.   Specifically, as described above, the Defendants conspired to and agreed personally and/ or through the conduct of their agents and/or others acting at their direction and on their behalf, would engage in repeated acts of extortion, mail fraud, and wire fraud.

319.   Each of the Defendants also conspired to violate 18 U.S.C. § 1962(a) by agreeing to use or invest income received, directly or indirectly, from a pattern of racketeering activity in the operation and furtherance of the Copyright Scheme and their respective businesses. This agreement was in violation of 18 U.S.C. § 1962(d).

320.   The Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

321.   As a direct and proximate result of the overt predicate acts of racketeering and of the Defendants' violation of 18 U.S.C. § 1962(d), the Class members have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

322.   As a result of their conspiracy in violation of 18 U.S.C. § 1962(d), the Defendants are liable to the Class members for their losses, in an amount to be determined at trial.

323.   In addition, pursuant to 18 U.S.C. § 1964(c), the proposed Class members are entitled to recover threefold their damages, plus costs and attorney's fees from the Defendants.

EIGHTH COUNT FOR RELIEF
**Negligent Misrepresentations and Omissions**

324.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

325. In the course of their business, the Defendants supplied information to the proposed Class members that was relevant and material to the Class members' determination of whether to enter into a settlement agreement.

326. The Defendants owed a duty to disclose to the proposed Class members all pertinent and material information relevant to the decision of whether to settle.

327. Due to the Defendants' failure to exercise reasonable care, the Defendants: (1) provided false and misleading information to the proposed Class members; and (2) failed to disclose to the proposed Class members pertinent and material information regarding statutory damages, attorney's fees, and Achte's copyright registration. This failure to disclose material information was tantamount to supplying false information.

328. The Defendants negligently made misrepresentations and failed to disclose material information to the proposed Class members with the intent that the proposed Class members would rely on the misrepresentations and omissions and agree to settle.

329. At the time they were made, the proposed Class members did not know that the representations were false and did not know the information that the Defendants negligently failed to disclose.

330. In deciding to enter into a settlement agreement and/or retain counsel, the proposed Class members reasonably and justifiably relied on the information, including the negligent misrepresentations, provided by the Defendants.

331. Had the proposed Class members known that these misrepresentations were not true or known the material information that the Defendants had a duty to disclose and failed to

disclose, they would neither have agreed to settle nor make significant expenditures to obtain legal advice.

332.   The proposed Class members in fact relied upon the Defendants' omissions and nondisclosures by agreeing to settle and/or making significant expenditures to obtain legal advice, which they would not have done had they been aware of the true facts

333.   As a direct and proximate result of the Defendants' negligent misrepresentations, omissions, and nondisclosures, and the proposed Class members' reliance on those misrepresentations and their reasonable belief that the concealed and undisclosed facts did not exist or were different from what the facts actually were, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

<u>TENTH COUNT FOR RELIEF</u>
**Fraud upon the Court**

334.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

335.   DGW, Dunlap and Kurtz (the "Attorney Defendants") were at all relevant times officers of the Court.

336.   The United States District Court for the District of Columbia (the "Court") relied on the Attorney Defendants' misrepresentations and fraudulent acts.

337.   The Attorney Defendants intentionally failed to disclose to and concealed from the Court, and engaged in a fraudulent scheme to keep the Court ignorant of, pertinent and material information regarding the Attorney Defendants' knowledge of the falsity of certain claims and the ulterior or illegitimate purposes for which they sought subpoenas.

338.   Specifically, the Attorney Defendants failed to disclose and concealed from the Court pertinent and material information that includes but is not limited to the following:

(a)   the Attorney Defendants, USCG, and Achte instituted the actions as a vehicle to discover the identities and contact information of the proposed Class members;

(b)   the Attorney Defendants, USCG, and Achte's shared intent, at all relevant times, was to use that information to improperly coerce the proposed Class members into entering settlement agreements;

(c)   Dunlap knowingly obtained a certificate of copyright registration for *Far Cry* on the basis of materially false information which, if the Register of Copyrights had known of the falsity, would have occasioned a rejection of the registration application;

(d)   the Attorney Defendants never intended to name members of the proposed Subclass I and Subclass II members as defendants in its action at the United States District Court for the District of Columbia; and

(d)   certain claims for relief prayed for by Achte were false, including Achte's claim for statutory damages and attorney's fees, which are Ineligible Remedies as to the members of the proposed Subclass I and Subclass II.

339.   The settlement funds Defendants collected from members of the proposed Class were used to further the Enterprise, which was initiated by the Attorney Defendants.

340.   In deciding to authorize the subpoenas requested by the Attorney Defendants, the Court reasonably and justifiably relied on the representations and misrepresentations they made.

341.   Had the Court known the truth of the Attorney Defendants' misrepresentations and the material information that the Attorney Defendants had a duty to disclose and failed to disclose, the Court would not have authorized the subpoenas.

342.   As a direct and proximate result of the Attorney Defendants' fraudulent misrepresentations, omissions, and nondisclosures, and the Court's reliance on those misrepresentations and its assumption that the concealed and undisclosed facts did not exist or were different from what the facts actually were, members of the proposed Class suffered injuries, damages, or losses in an amount to be determined at trial.

### ELEVENTH COUNT FOR RELIEF
**Abuse of Process**

343.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

344.   Defendants willfully misused and/or misapplied the subpoena process for an end other than that which it was designed to accomplish.

345.   The Defendants intentionally failed to disclose to and concealed pertinent and material information regarding Defendants' knowledge of the falsity of certain claims raised by or on behalf of Achte, and the ulterior or illegitimate purpose for which the subpoenas were sought.

346.   Specifically, the Defendants failed to disclose and concealed pertinent and material information that includes but is not limited to the following:

   (a)   Defendants instituted the Achte action as a vehicle to discover the identities and contact information of Class members;

(b)      upon receiving that information, Defendants threatened members of the Class with claims for statutory damages and attorney's fees, though those remedies were categorically prohibited;

(c)      Defendants improperly coerced members of Subclass I and Subclass II into entering settlement agreements under extortionate threats of financially burdensome lawsuits and fraudulent threats of remedies that are prohibited as a matter of law, regardless of the individual merits of each case; and

(d)      Defendants did not seriously consider in good faith litigating claims against any member of the proposed Subclass I or Subclass II as a named defendant, but rather intended to prolong the Achte action and move to dismiss claims after securing the greatest amount of settlements possible.

347.    As a direct and proximate result of the Defendants' conduct, individually and collectively, members of Subclass I and Subclass II were forced to expend a significant amount of time and money in settling and defending against frivolous claims, and thereby suffered injuries, damages, or losses in an amount to be determined at trial.

TWELFTH COUNT FOR RELIEF<br>

**Fraud on the Copyright Office**

348.    Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

349.    Upon information and belief, Defendants intentionally and fraudulently failed to submit the proper date of first publication in the application for copyright registration for the motion picture *Far Cry*.

350.   Upon information and belief, Defendants intentionally and fraudulently submitted an incorrect date of first publication in the application for copyright registration for the motion picture *Far Cry*.

351.   By submitting an incorrect date of first publication, Defendants knowingly made a misrepresentation of a material fact in the application.

352.   Had the Copyright Office known of the fraud, it would not have issued a copyright registration for the movie *Far Cry*.

353.   Defendants' actions constituted fraud upon the Copyright Office.

354.   As a result of the fraud upon the Copyright Office as described above, Defendants caused members of the Class to expend significant time and money in defending and/or settling frivolous and/or meritless claims. Proposed Class members are entitled to relief including, but not limited to, injunctive relief, actual damages (trebled, at the Court's discretion), statutory costs and attorneys' fees, and prejudgment interest.

THIRTEENTH COUNT FOR RELIEF
**Copyright Misuse**

355.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

356.   The Defendants engaged in abusive and/or improper conduct in exploiting or enforcing Achte's copyright.

357.   Specifically, when they threatened infringement penalties that exaggerated and misstated the law, Defendants misled and defrauded members of Subclass I and Subclass II into paying settlements many times greater than the Copyright Act permits, and/or paying to retain counsel. Defendants threatened Plaintiffs with statutory damages of up to $150,000

and attorney's fees, though Achte's remedy would be limited to actual damages in any case where Defendants were able to prove their claims. Defendants attempted to extend the effect or operation of Achte's copyright beyond the scope of the statutory right by improperly coercing members of the Class into entering settlement agreements with threats of statutory damages awards, attorney's fees, and financially burdensome lawsuits, regardless of the individual merits of each case and the absolute statutory bar on the extraordinary forms of relief that Defendants nonetheless deceptively claimed from members of Subclass I and Subclass II.

358.   The Defendants also engaged in abusive and/or improper conduct in the registration of Achte's copyright. Defendants DGW, Dunlap, and Achte misrepresented the date of first publication when Dunlap submitted the application for copyright registration for *Far Cry*, and wrongfully procured a registration certificate that appears to permit greater protections than the Copyright Act in fact allows.

359.   Section 412(2) of the Copyright Act generally bars awards of statutory damages and attorney's fees when a published work is infringed after the first publication but before the copyright registration is effective.  *Far Cry* was first published no later than April 14, 2009, and the registration was not effective until January 19, 2010, so infringements that commenced between those dates generally cannot obtain those extraordinary remedies. But Section 412(2) includes a three-month grace period, allowing those remedies if the work is registered within three months of publication.

360.   When registering the copyright Achte, through its agents DGW and Dunlap, falsely listed November 24, 2009 as the date of first publication.

361.   The certificate of copyright registration issued with that false date. On its face, it appears to qualify Achte for the statutory grace period, which would entitle Achte to seek statutory damages and attorney's fees for any acts of infringement that commenced after the fraudulently claimed date of first publication (November 24, 2009), but prior to the effective date of registration (January 19, 2010).   Achte has threatened to seek those heightened remedies in litigation against Plaintiff and other members of Subclass II, whom Achte alleges infringed its copyright between those two dates.

362.   Achte's bald attempt to expand its copyright monopoly by deception and avail itself of unwarranted remedies constitutes copyright misuse.

363.   As a direct and proximate result of the Defendants' extortion threats and false representations, and Class members' reliance on those threats and false representations, members of the Class suffered injuries, damages, or losses in an amount to be determined at trial.

364.   Members of the Class are entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

FOURTEENTH COUNT FOR RELIEF
**Civil Conspiracy**

365.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

366.   Each Defendant has acted in concert and participated in a common plan to achieve the unlawful acts described above.

367.  Each Defendant has collaborated in false representations designed to cloak their claims, against Shirokov and each other member of the proposed Class, in color of right.  They thereby acted in unison to exercise coercive powers, over Shirokov and the proposed Class, that they would not have had if acting independently.

368.  Specifically, Dunlap and DGW established USCG in partnership with GuardaLey to enable a copyright claim business model of mass settlements under the guise of litigation, and were engaged by Achte to apply that business model to a motion picture, Far Cry, whose copyright had not yet been registered.

369.  Knowing that Achte had not yet registered its copyright in a film released more than three months earlier, Dunlap and DGW nonetheless engaged GuardaLey to collect information on alleged infringers, including thousands whose alleged acts of infringement took place when Dunlap and DGW knew claims of statutory damages would be barred.

370.  On behalf of Achte, DGW and Dunlap supplied knowingly false information to the U.S. Copyright Office to obtain registration.

371.  DGW, Dunlap, and GuardaLey, on behalf of Achte, made knowingly false statements in court concerning the copyright, the remedies available to Achte, and/or the basis for Achte's claims of jurisdiction over members of the proposed Class (including Shirokov).

372.  DGW, Dunlap, Kurtz, and USCG, on behalf of Achte, made knowingly false statements to Shirokov and other members of the proposed Class concerning the copyright, the remedies available to Achte, and/or the basis for Achte's claims of jurisdiction over members of the proposed Class (including Shirokov).

373.   The Defendants' concerted actions constitute a civil conspiracy, which employed unlawful conduct to cause damage to Shirokov and to other members of the proposed Class.

374.   The Defendants' concerted actions caused harm to Shirokov and to other members of the proposed Class that could not have been caused by any Defendant acting alone.

375.   The Defendants' concerted actions have at all times relevant to this action been willful and/or knowing.

376.   As a direct and proximate result of Defendants' concerted actions and civil conspiracy, Shirokov and other members of the proposed Class have been and will continue to be damaged.

<u>FIFTEENTH COUNT FOR RELIEF</u>
**Civil Conspiracy**

377.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

378.   Each Defendant has acted in concert and participated in a common plan to achieve the unlawful acts described above.

379.   Each Defendant has collaborated in false representations designed to cloak their claims, against Shirokov and each other member of the proposed Class, in color of right.  They thereby acted in unison to exercise coercive powers, over Shirokov and the proposed Class, that they would not have had if acting independently. Specifically:

(a)   Dunlap and DGW established USCG in partnership with GuardaLey to enable a copyright claim business model of mass settlements under the guise of litigation,

and were engaged by Achte to apply that business model to a motion picture, Far Cry, whose copyright had not yet been registered.

(b) Knowing that Achte had not yet registered its copyright in a film released more than three months earlier, Dunlap and DGW nonetheless engaged GuardaLey to collect information on alleged infringers, including thousands whose alleged acts of infringement took place when Dunlap and DGW knew claims of statutory damages would be barred.

(c) On behalf of Achte, DGW and Dunlap supplied knowingly false information to the U.S. Copyright Office to obtain registration.

(d) DGW, Dunlap, and GuardaLey, on behalf of Achte, made knowingly false statements in court concerning the copyright, the remedies available to Achte, and/or the basis for Achte's claims of jurisdiction over members of the proposed Class (including Shirokov).

(e) DGW, Dunlap, Kurtz, and USCG, on behalf of Achte, made knowingly false statements to Shirokov and other members of the proposed Class concerning the copyright, the remedies available to Achte, and/or the basis for Achte's claims of jurisdiction over members of the proposed Class (including Shirokov).

380. The Defendants' concerted actions constitute a civil conspiracy, which employed unlawful conduct to cause damage to Shirokov and to other members of the proposed Class.

381. The Defendants' concerted actions caused harm to Shirokov and to other members of the proposed Class that could not have been caused by any Defendant acting alone.

382.    The Defendants' concerted actions have at all times relevant to this action been willful and/or knowing.

383.    As a direct and proximate result of Defendants' concerted actions and civil conspiracy, Shirokov and other members of the proposed Class have been and will continue to be damaged.

SIXTEENTH COUNT FOR RELIEF<br>**Unjust Enrichment**

384.    Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

385.    The Defendants were enriched and benefited by appropriating payments they received from the Class. The Defendants received benefits in various ways, including through direct payments.

386.    The Defendants recognized, accepted, and retained all these benefits at the proposed Class members' expense and did not provide equitable recompense.

387.    Because of the Defendants' actions, members of the proposed Class incurred unnecessary and unwarranted financial damages.

388.    Given the circumstances described in this Complaint—including the fact that each Defendant directed, encouraged, knew of, and/or facilitated fraudulent and illegal conduct—it would be inequitable and unjust for the Defendants to retain the benefits they received at the expense of the members of the Class.

389.    The members of the Class are entitled to all lawful and equitable remedies attendant to the Defendants' unjust enrichment, including restitution of all fees, monies, and assets

unjustly retained, or converted for the Defendants' use, to the detriment of the Class members, and disgorgement of profits or gains on such fees, monies, and/or assets.

SEVENTEENTH COUNT FOR RELIEF
**Money Had and Received**

390.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference each and every allegation contained in this Complaint.

391.   Defendants received settlement payments from members of the proposed Class.

392.   As described in this Complaint, the money received by Defendants was intentionally, fraudulently, and illegally appropriated for the Defendants' use.

393.   The Defendants thereby received or obtained possession of money which in equity and good conscience belongs to the proposed Class members.

394.   The proposed Class members are entitled to all lawful and equitable remedies attendant to the Defendants' misconduct, including restitution of all such fees, monies, or assets purchased with the monies unlawfully had and received, and disgorgement of profits generated by the fees, monies or assets.

EIGHTEENTH COUNT FOR RELIEF
**Conversion**

395.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

396.   Members of the proposed Class had a right of ownership and entitlement to the immediate possession of funds they paid to Defendants under settlement agreements.

397.    The funds were placed in the custody of USCG for the specific purposes of compensating the rights-holder Achte to avoid litigating its claims for awards of statutory damages and attorney's fees.

398.    The Defendants diverted and misappropriated the funds for the other and different purposes of using the funds for their own use and different business interests that were in conflict with and unrelated to the purpose of deterring infringement through awards of statutory damages.

399.    The Defendants' misappropriation of the funds deprived members of the proposed Class of their possessory rights to the funds.

400.    As a result of the Defendants' conduct, members of the proposed Class are entitled to recover the value of the converted funds, plus interest calculated from the time of conversion.

401.    Members of the proposed Class are entitled to punitive damages because the Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive or reckless indifference to the rights of others.

NINETEENTH COUNT FOR RELIEF
**Constructive Trust**

402.    Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

403.    The Defendants, through their fraudulent conduct, induced members of the proposed Class into paying money and entering into settlement agreements under the threat of statutory damages that Defendants could not obtain as a matter of law.

404.   The Defendants wrongfully diverted monies from members of the proposed Class in violation of statutory and common law and used the proceeds for their legitimate businesses and to further their scheme.

405.   The Defendants have retained property which rightfully belongs to members of the proposed Class.

406.   The proposed Class members request the Court impose a constructive trust on the Defendants' property, including accounts and real and personal property of each individual Defendant, and accounts and property owned by each entity, and order an equitable accounting of such property.

TWENTIETH COUNT FOR RELIEF
**Consumer Protection Violations**

407.   Plaintiff, on behalf of himself and all others similarly situated, incorporates by reference all allegations contained in this Complaint.

408.   The Defendants knowingly and intentionally engaged in the unfair, unlawful, deceptive, and unconscionable trade practices set forth above that violate numerous state consumer protection acts.

409.   Plaintiff, on behalf of himself and all others similarly situated, asserts claims under all state consumer protection acts where the conduct underlying the violations, or the injuries, occurred. This includes, but is not limited to:

a) District of Columbia: Defendants' practices were and are in violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.*;

b) Massachusetts: Defendants' practices were and are in violation of the Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws Ch. 93A, § 1, *et seq.*; and

c) Virginia: Defendants' practices were and are in violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200, *et seq.*

410.   The Defendants' unfair, unlawful, and deceptive trade practices occurred in the course of the Defendants' scheme and the challenged practices directly caused actual damages and injury to the proposed Class.

411.   The Defendants intended that the proposed Class rely on their deceptions which occurred in and affected the course of conduct involving trade or commerce.

412.   The Defendants made a misrepresentation or omission of a material fact in connection with the sale of merchandise and the misrepresentation or omission proximately caused injury to the proposed Class.

413.   The proposed Class relied on the Defendants' misrepresentations and deceptive acts, which acts are uncured.

414.   The Defendants used or employed a deception, a fraud, a false pretense, a false promise, a misrepresentation, an unfair practice, or a concealment, suppression or omission of a material fact; the unlawful act occurred in connection with the unfair or deceptive practices in trade or commerce to the proposed Class; members of the proposed Class suffered an ascertainable loss of money as a result of the unlawful act(s); and the loss arose from the Defendants' failure to disclose and concealment from the proposed Class the true facts regarding the scope of Achte's copyright, the falsity in its registration, and its lack of intent to fully litigate its claims.

415.   Plaintiffs also seek permanent injunctive relief as a result of the Defendants' ongoing violations of state consumer-protection statutes, including an order directing Defendants

to provide Plaintiff and members of the Class with all material facts relating to Defendants' scheme, including any and settlements received, waiver of any and all non-disclosure terms in the settlement agreements and the identities of all proposed Class members.

416.  The provision of such information will allow Plaintiff and the proposed Class members the opportunity to make informed decisions regarding their rights and prevent Defendants from perpetrating the scheme.

417.  A monetary award will fail to provide full relief to the Class. Money damages will not compensate Plaintiff and proposed Class members for their current lack of information and such information and the ability to disseminate such information is in the exclusive control of Defendants. Absent a court order, Plaintiff and proposed Class members and the public will be unable to obtain the information necessary to make informed decisions regarding their rights.

418.  By reason foregoing, Plaintiff and proposed Class members are entitled to treble damages, punitive damages, injunctive relief, attorney fees and costs as provided by the state consumer protection acts where the conduct underlying the violations, or the injuries, occurred.

### RELIEF REQUESTED

WHEREFORE, Plaintiff seeks the following remedies:

1)  For an order certifying the Class and any appropriate subclasses thereof under the appropriate provisions of Federal Rule94 of Civil Procedure 23, and appointing Plaintiff and his counsel to represent the Class;

2)    Damages in an amount to be proven at trial, including but not limited to compensatory and consequential damages;

3)    Treble damages under RICO, 18 U.S.C. §§ 1961 et seq.; the Copyright Act, 17 U.S.C. § 101 *et seq*.,; and respective state consumer fraud protection acts;

4)    Punitive damages on any and all causes of action permitting such damages;

5)    Actual or statutory damages at the election of the proposed Class members;

6)    Restitution of all money that Defendants obtained from members of the Plaintiff Class in settlements based on fraudulent statements and extortionate threats;

7)    Reimbursement of all money that members of the Plaintiff Class spent on legal representation, court costs and other expenses that would have been avoided if not for Defendants' false, fraudulent, deceptive, misleading, and/or negligent statements, representations, and/or omissions;

8)    The imposition of a constructive trust on all monies provided by the proposed Class members to the Defendants and all assets acquired with such funds;

9)    Equitable accounting, including accounting to proposed Class members for any and all gains, profits, and advantages derived by Defendants from the scheme, and any and all proposed Class members' litigation expenses, including reasonable attorney fees and the costs of this action;

10)   An attachment against the Defendants' property, attorney fees, and costs as provided by M.G.L. c. 223 § 42 and respective state statutes;

11)   Injunctive relief preventing the sale or disposition of Defendants' assets acquired through the scheme;

12)     Injunctive relief to stop the scheme;

13)     Injunctive relief to reveal the identities of all known proposed Class members;

14)     Attorney fees and costs incurred by members of the proposed Class in settling or
        otherwise responding to claims brought by Defendants;

15)     Dismissal of all court actions related to the matter brought by Defendants against
        members of the proposed Class;

16)     An order enjoining Defendants from bringing suit against any member or members of the
        proposed Class as a named defendant or John Doe defendant in any court, including but
        not limited to this Court and the U.S. District Court for the District of Columbia, pending
        full resolution of this matter;

17)     An order declaring that Defendant Dunlap, as agent for Defendant Achte, included
        inaccurate information on the application for copyright registration with knowledge that
        it was inaccurate, pursuant to 17 U.S.C. § 411(b)(1);

18)     A notice issued by this Court to the Register of Copyrights requesting advice on whether
        the inaccurate information, if known, would have caused the Register of Copyrights to
        refuse registration, pursuant to 17 U.S.C. § 411(b)(2);

19)     An order declaring the certificate of copyright registration for *Far Cry* invalid due to
        Defendant's fraud on the Copyright Office and copyright misuse;

20)     Waiver by Defendants of all settlement agreements with members of the proposed Class;

21)     A finding of alter ego status for the US Copyright Group, including but not limited to,
        Defendants Thomas Dunlap, Nicholas Kurtz, Dunlap, Grubb & Weaver, PLLC and

Achte/Nuente Boll Kino Beteiligungs and joint and several liability imposed for the damages caused by their actions;

22)  Attorney fees and costs incurred by the proposed Class in prosecuting this action;

23)  Pre-judgment and post-judgment interest as provided by pursuant to 28 U.S.C. § 1961, M.G.L. c. 231 § 6F, M.G.L. c. 235 § 8 and respective state statutes; and

24)  Additional and/or alternative relief as the Court may deem to be just, equitable and appropriate.

**JURY DEMAND**

Plaintiff, on behalf of himself and all other similarly situated, hereby demand a trial by jury in this case.


Dated: February 8, 2011


/s/ Daniel G. Booth
/s/ Jason E. Sweet
Daniel G. Booth (BBO# 672090)
Jason E. Sweet (BBO# 668596)
BOOTH SWEET LLP
32R Essex Street, Suite 1
Cambridge, MA 02139
Telephone: (617) 250-8602
Facsimile: (617) 250-8883

*Attorneys for Plaintiff and Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2011, I electronically filed the foregoing First

Amended Complaint, plus Exhibits A through P, by using the ECF system, and that a true copy of

the aforementioned documents will be served upon counsel of record for Defendants Dunlap,

Grubb & Weaver, PLLC, Thomas Dunlap, and Nicholas Kurtz by Notice of Electronic Filing

through the ECF system.

I further certify that true copies of the aforementioned documents will be timely served

upon Defendants US Copyright Group, Guardaley, Limited, and Achte/Neunte Boll Kino

Beteiligungs Gmbh & Co KG.

/s/  Daniel G. Booth
Daniel G. Booth (BBO# 672090)
BOOTH SWEET LLP
32R Essex Street, Suite 1A
Cambridge, MA 02139
Telephone: (617) 250-8602
Facsimile: (617) 250-8883